UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

SANDRA GALE
Plaintiff,

v. CIVIL ACTION NO. 22-cv-11932-MPK[1]

CITY OF MEDFORD,
Defendant.

MEMORANDUM AND ORDER ON THE CROSS-MOTIONS FOR SUMMARY JUDGMENT (##64, 75)

KELLEY, U.S.M.J.

I. Introduction.

This case, brought by Sandra Gale against the City of Medford, presents federal and state wage claims following Ms. Gale's long employment in the City's election division. Ms. Gale filed suit shortly after her employment came to an end, which was followed by proceedings before the Massachusetts Department of Labor Relations ("DLR").

The City was sued by other employees concerning its wage practices before Ms. Gale filed her suit; those cases settled before trial.[2] This court must decide whether Ms. Gale's allegations

---

[1] The parties have consented to proceeding before the undersigned United States Magistrate Judge for all purposes, including trial and entry of final judgment, pursuant to 28 U.S.C. § 636(c). (#8.)

[2] *See MacGlivray et al. v. City of Medford*, #06-cv-10909-NMG; *Aborn v. City of Medford*, #08-cv-10760-RBC; *Howard et al. v. City of Medford*, #21-cv-10497-IT; *Connors et al. v. City of Medford*, #21-cv-11748-MPK. This court also presided over *Fargo et al. v. City of Medford*, #22-cv-11765-MPK, and *Conboy v. City of Medford*, #22-cv-11973-MPK. Ms. Gale's counsel represented the *Howard*, *Connors*, *Fargo*, and *Conboy* plaintiffs.

should proceed to trial.[3] For the reasons set out below, the court grants summary judgment to the Plaintiff and the City on some claims, but on most, there are genuine and material factual disputes that must be resolved by a jury. The Plaintiff's motion for summary judgment (#64) and the City's cross-motion for summary judgment (#75) are allowed in part and denied in part.

II. The Plaintiff's Claims.

The Plaintiff filed the original complaint on November 14, 2022. (#1.) Without objection from the City and with leave of the court, she filed the first amended complaint on November 20, 2024. The first amendment added what is now Count VII. (##38, 42); *see* #43 (the first amended complaint).

Over the City's objection but with leave of the court, the Plaintiff filed the second amended complaint on September 19, 2025. The second amendment added Count VI. (##54, 58, 61.) The SAC, erroneously captioned as a first amended complaint, *see* #62, is the operative complaint.

The SAC does not allege many facts and it is challenging to understand what the claims are. "Count III" does not exist. *See* ##1, 43, 62. Fairly read, the SAC raises these claims:

In Count I, captioned "Failure to Pay FLSA Overtime Due to Misclassification," the Plaintiff claims that the City violated the FLSA, 29 U.S.C. § 207(a), by failing to pay overtime wages for the hours that the Plaintiff worked in excess of 40 hours a week. (#62 at 3, ¶¶ 13-23.) According to the SAC, "[a]t all times relevant hereto," the City was required to pay the Plaintiff

---

[3] The Plaintiff seeks summary judgment on liability on all counts of the second amended complaint ("SAC"), plus liquidated damages under the Fair Labor Standards Act ("FLSA"), with the amount of damages to be determined at further proceedings. The City seeks summary judgment on liability on all counts. *See* #64, the Plaintiff's motion; #65, the Plaintiff's memorandum in support of her motion; #75, the City's opposition to the Plaintiff's motion and cross-motion with incorporated memorandum in support of its cross-motion; #81, the Plaintiff's reply in further support of her motion; ##82-83, the Plaintiff's opposition to the City's cross-motion; #85, the City's reply in further support of its cross-motion.

overtime wages under the FLSA, *see* #62 ¶¶ 15, 20, and "[d]uring the time [that the City] employed her," first as the Election Consultant and then as the Election Coordinator, none of the narrow exemptions to the FLSA overtime requirements applied, *see id.* ¶¶ 3, 18. The court understands "[a]t all times relevant hereto" to include when the Plaintiff was the Election Consultant, but no more than "three years prior to the commencement of this action." *See id.* ¶¶ 3, 6, 12.

In Count II the Plaintiff claims that the City violated the FLSA, 29 U.S.C. § 207(a), by failing to pay her overtime wages for the hours that she worked in excess of 40 hours a week. *See* #62 ¶ 36; *but see id.* ¶ 34 ("…at either Plaintiff's straight time or overtime rates of pay"). This claim is based on the Plaintiff's "off-the-clock work" during the one-hour lunch breaks that the City allegedly "automatic[ally] deduct[ed]" from her Monday, Tuesday, Wednesday, and Thursday shifts, and before and after her shifts. *Id.* ¶¶ 7-11, 29, 32.

In Count IV the Plaintiff claims that the City violated Mass. Gen. Laws ch. 149, § 33B, by failing to pay her overtime wages for the hours that she worked in excess of 8 hours a day and 40 hours a week. (#62 ¶¶ 38-44.)

In Count V the Plaintiff claims that the City violated the Massachusetts Wage Act, Mass. Gen. Laws ch. 149, § 148, by failing to pay her straight-time wages for the "off-the-clock work." (#62 ¶¶ 45-59.)

In Count VI the Plaintiff claims that the City had a binding personnel policy and that it violated that policy when it did not pay her overtime wages for the hours that she worked in excess of 35 hours a week. *Id.* ¶¶ 60-68. This policy is included in the City's employee handbook dated December 1, 2019, excerpts of which appear at #66-4 and #78-15. No other version of the employee handbook is part of the summary judgment record.

In Count VII the Plaintiff again claims a violation of Mass. Gen. Laws ch. 149, § 148.

Noting that § 148 "covers straight-time wages and any additional wages" and required the payment of the Plaintiff's earned wages within 6 days of the termination of the pay period in which she earned them, *see* #62 ¶¶ 70-71, the count alludes to the City's purported "practice" of paying employees' overtime wages one week in arrears, *see id*. ¶ 72, and asserts that the City also violated § 148 because it failed to pay the Plaintiff the overtime wages she earned under Mass. Gen. Laws ch. 149, § 33B, *see* #62 ¶ 74, and the employee handbook, *see id*. ¶ 75.

III. <u>Summary Judgment Standard</u>.

"The role of summary judgment in civil procedure is 'to pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Mesnick v. General Elec. Co.*, 950 F.2d 816, 822 (1st Cir. 1991) (cleaned up) (citations omitted); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). A district court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact has the potential to affect the outcome of the case; "genuine" means that given the evidence, a reasonable jury could resolve the dispute in the non-movant's favor. *See John B. Cruz Const. Co., Inc. v. Beacon Communities Corp*., 169 F.4th 89, 95 (1st Cir. 2026); *Hamdallah v. CPC Carolina PR, LLC*, 91 F.4th 1, 16 (1st Cir. 2024).

The movant bears the initial burden to show that there is no genuine dispute of any material fact and the court takes all facts and reasonable inferences drawn from them in favor of the non-movant. *Hamdallah*, 91 F.4th at 16-17; *see Mesnick*, 950 F.2d at 822. "At the summary judgment stage,…there is no room for credibility determinations, no room for the measured weighing of conflicting evidence such as the trial process entails, no room for the judge to superimpose [her] own ideas of probability and likelihood (no matter how reasonable those ideas may be)." *Velez-Gomez v. SMA Life Assur. Co*., 8 F.3d 873, 877 (1st Cir. 1993) (cleaned up) (citation omitted).

To defeat a summary judgment motion, the non-movant must highlight specific facts showing that a reasonable jury could resolve the relevant dispute in the non-movant's favor. *John B. Cruz Const.*, 169 F.4th at 95; *see Hamdallah*, 91 F.4th at 17. "Conclusory allegations, improbable inferences, and unsupported speculation do not count…. Pointing to the mere existence of a scintilla of evidence is also not enough…." *John B. Cruz Const.*, 169 F.4th at 95 (cleaned up) (citations omitted); *see also Adamson v. Walgreens Co*., 750 F.3d 73, 78 (1st Cir. 2014) (the court is "not obligated to accept as true or deem as a disputed material fact, each and every unsupported, subjective, conclusory, or imaginative statement made to the court by a party") (cleaned up) (citation omitted); *Vega v. Kodak Caribbean, Ltd*., 3 F.3d 476, 479 (1st Cir. 1993) ("the material creating the factual dispute must herald the existence of 'definite, competent evidence'…") (quoting *Mesnick*, 950 F.2d at 822).

Cross-motions for summary judgment do not alter the basic summary judgment standard. The court considers the motions separately, taking the facts and reasonable inferences against each of the movants. *Lawless v. Steward Health Care Sys., LLC*, 894 F.3d 9, 21 (1st Cir. 2018).

A party asserting that a fact cannot be or is genuinely disputed "must support the assertion by…citing to particular parts of materials in the record…or…showing that the materials cited do not establish the absence or presence of a genuine dispute…." Fed. R. Civ. P. 56(c)(1)(A)-(B). "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). Affidavits "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Evidence that is inadmissible at trial, including inadmissible hearsay, may not be considered on summary judgment. *Vazquez v. Lopez-Rosario*, 134 F.3d 28, 33 (1st Cir. 1998). If

an opponent of hearsay evidence fails to raise an objection, however, the court may consider it. *Bellone v. Southwick-Tolland Reg. Sch. Dist.*, 748 F.3d 418, 420 n.2 (1st Cir. 2014).

IV. Facts.[4]

A. The Start and End of the Plaintiff's Employment.

This case does not directly concern the beginning of the Plaintiff's decades' long employment by the City. The Plaintiff does not seek relief for allegedly improper wage practices by the City before November 14, 2019, which is three years before she filed her original complaint. *See* #62 ¶ 12; #65 at 1.[5] The court discusses earlier events for context.

Nor does this case directly concern the City's termination of the Plaintiff's employment, about a month before she filed her original complaint. The court discusses the circumstances of her termination mainly for context.

1. The start of the Plaintiff's employment.

[4] The Plaintiff filed an initial statement of facts, *see* #66, supported by her affidavit, *see* #66-1 ("Gale Aff."), and exhibits, *see* #66-2 through #66-23. The City filed a response and asserted additional facts, *see* #76, supported by an affidavit of the City's Chief of Staff, Nina Nazarian, *see* #77, and exhibits to an affidavit of counsel, *see* #78-1 through #78-15. The Plaintiff filed a response, *see* #84 ¶¶ 68-80, and asserted additional facts, *see id.* ¶¶ 81-87, supported by her "Supplemental" affidavit, *see* #84-2 ( "Gale Supp. Aff."), and an affidavit of the City's former Finance Director, Aleesha Nunley Benjamin, *see* #84-3, and exhibits, *see* #84-1, #84-4. The City filed a response to the Plaintiff's additional facts. *See* #86. The Plaintiff and the City rely in their briefing on testimony at a May 22, 2024, hearing before the DLR, excerpts of which appear at #66-2 and #78-1. The court cites to the excerpts as "[Witness] DLR Tr. at [transcript page number] ([ECF document number] at [ECF page number])." The court cites to the excerpts of deposition transcripts similarly.

The following facts are adequately supported by the record. Assertions that have not been addressed have been found unsupported. The court notes when facts are disputed.

[5] The FLSA imposes a two-year statute of limitations unless the violations are shown to be willful, in which case a three-year statute of limitations applies. *See* 29 U.S.C. § 255(a); *Reich v. Newspapers of New England, Inc.*, 44 F.3d 1060, 1079 (1st Cir. 1995). The Massachusetts Wage Act imposes a three-year statute of limitations. *See* Mass. Gen. Laws ch. 149, § 150 ("An employee claiming to be aggrieved by a violation of section[]…148…may… within 3 years after the violation, institute… a civil action …").

The Plaintiff began working for the City in the early 1990s as an Election Inspector. (#66 ¶ 1; #76 ¶ 1); *contrast* Gale Aff. ¶ 2 *with* Gale DLR Tr. at 23 (#66-2 at 12). At all times relevant to this case, the City Clerk was responsible for elections. The City Clerk was assisted by a Board of Registrars of Voters ("Board"). The City Clerk was also the Board's clerk but had no voting authority. The Registrars of Voters Office, which had permanent, full-time staff, was an office within the City Clerk's. *See* #66 ¶¶ 3, 5, 36; #76 ¶¶ 3, 5, 36; *see also* Nazarian DLR Tr. at 109 (#66-2 at 45).

According to her testimony before the DLR, by the late 1990s or early 2000s, she was "trained as an inspector, a clerk, a warden. [She] knew all of the positions in the polling locations." Gale DLR Tr. at 24 (#66-2 at 13). In 2010 or 2011 the Board chairman began referring to her as an "election consultant;" the Plaintiff attests that at that time, she was only working about 60 hours a year. (#66 ¶ 4; Gale Aff. ¶ 5); *see also* #76 ¶ 4.[6]

From 2011 to 2018, the Plaintiff, among other activities, trained seasonal, part-time poll workers, entered voter registration data, helped set up polling places, tested voting machines, and processed ballots. (#66 ¶ 2; #76 ¶ 2); *see* Gale Aff. ¶ 3. In 2018, Adam Hurtubise became the City Clerk. (#66 ¶ 5; #76 ¶ 5); *see* Gale Aff. ¶ 6, and he expanded the Plaintiff's election-related duties. (#66 ¶ 6; #76 ¶ 6); *see* Gale Aff. ¶ 7.

The Plaintiff asserts that the City employed no more than 100 poll workers in any year and that poll workers occasionally worked during early voting, but generally only worked the two annual election days, averaging 14 to 16 hours a year. (#66 ¶ 35); *see* Gale Aff. ¶ 36. The City does

[6] The court understands that "Election Consultant" was eventually recognized as an official position and while the Plaintiff held the position as early as 2015, it was altered in 2020, and she was appointed to the altered position effective October 14, 2020. *See* #76 ¶ 68; #84 ¶ 68; *see also infra*.

not address the Plaintiff's assertions regarding the number of poll workers employed and when and how many hours they worked. *See* #76 ¶ 35. The court treats these assertions as admitted. *See* L.R. 56.1.

2. <u>The end of the Plaintiff's employment</u>.

In 2022, the Plaintiff joined other non-unionized City employees in efforts to have the Teamsters Local 25 certified as their bargaining representative. The DLR certified the union in February 2022. (#66 ¶ 37; #76 ¶ 37); *see* Gale Aff. ¶ 38.

The next month, the City Council amended the City Charter to shift election administration away from the City Clerk and the Board and to a new Election Department. This shift created an "Election Manager" position. The Election Manager would be the department head and report to the Mayor and an Election Commission. (#66 ¶ 28; #76 ¶ 28); *see* Gale Aff. ¶ 27. The City advertised the new position as "Non-Union FLSA Exempt" and with a salary range of $1,392.91 to $1,627.85 a week. *See* #66-10 at 2 (Election Manager job posting). The job posting described the "Basic Function" of the position as supporting the work of the Election Commission and ensuring that the City meets legislative and regulatory requirements for elections; coordinating and undertaking tasks associated with federal, state, and municipal elections; working with vendors and other City departments to schedule and set up polling locations for each election; recruiting, hiring, and scheduling poll workers for each election; and assisting with all aspects of the election process. *Id*.

In the summer of 2022, the Plaintiff, who, by then, held the position of "Election Coordinator," applied for the Election Manager position. She sat for two interviews, the second on August 10. Ultimately, she was not selected. (#66 ¶ 30; #76 ¶ 30); *see* Gale Aff. ¶ 29.

Five days after she sat for the second interview, the Plaintiff filed a workplace safety

complaint with the DLR alleging unsafe and hazardous conditions at City Hall, *see* #66 ¶ 38; #76 ¶ 38; *see also* Gale Aff. ¶ 39, including black mold, exposed electrical wires, asbestos, rats and cockroaches, standing water, etc., *see* #66-13 at 2 (workplace safety complaint).

Three days after the Plaintiff filed the workplace safety complaint, the Teamsters Local 25 filed an unfair labor practice charge against the City alleging that it eliminated her union Election Coordinator position and replaced it with the non-union Election Manager position. (#66 ¶ 39; #76 ¶ 39); *see* Gale Aff. ¶ 40. The union wrote, in part: "The duties and responsibilities set forth in the respective job descriptions are functionally identical." *See* #66-14 at 2 (first charge).

On September 12, 2022, the Plaintiff was placed on administrative leave. On October 13, she was given formal notice of termination, effective October 21, 2022. (#66 ¶ 31; #76 ¶ 31); *see* Gale Aff ¶ 30. Also on September 12, the Teamsters Local 25 filed a second unfair labor practice charge against the City alleging that the Plaintiff's employment was terminated because she filed the workplace safety complaint. *See* #66 ¶ 40; #76 ¶ 40; *see also* Gale Aff. ¶ 41; #66-15 at 2 (second charge).

On April 3, 2023, the DLR found probable cause of retaliation and issued a complaint of prohibited practice against the City. *See* #66 ¶ 40; #76 ¶ 40; *see also* Gale Aff. ¶ 41; #66-16 (complaint of prohibited practice). After the May 22, 2024, DLR hearing, the retaliation complaint was resolved. (#66 ¶ 41; #76 ¶¶ 40-41); *see* Gale Aff. ¶ 42.

B. <u>Periods of the Plaintiff's Employment Relevant to this Lawsuit</u>.

1. <u>November 14, 2019, to October 14, 2020:<br>Election Consultant; No overtime paid</u>.

For purposes of summary judgment, it is undisputed that from November 14, 2019, until her termination, the City calculated the Plaintiff's wages on a recurring weekly basis, using Sunday through Saturday as the workweek. (#66 ¶ 63; #76 ¶ 63); *see* Gale Aff. ¶ 64.

It is also undisputed that when she was the Election Consultant, the Plaintiff tracked her own hours and submitted them for approval on time sheets. (#66 ¶ 56; #76 ¶ 56); *see* Gale Aff. ¶ 56. With her summary judgment motion, the Plaintiff has submitted "[e]xemplars" of the time sheets, *see* #66 ¶ 56, which appear at #66-18. The latest "exemplar" time sheet in the record is dated October 25, 2020. *See id.* This is so notwithstanding that the Plaintiff submitted her hours for approval on time sheets into 2021. *See* #66 ¶¶ 58-59; #76 ¶¶ 58-59; *see also* Gale Aff. ¶¶ 58-60.

The Plaintiff asserts, and for purposes of summary judgment, the City does not dispute, that she kept personal calendars on which she recorded her weekly hours. (#66 ¶ 60; #76 ¶ 60); *see* Gale Aff. ¶ 61. The personal calendars appear at #66-19. There are no personal calendars from 2019 in the record. The pages that include handwritten notations are from February 2020 to September 2022. *See id.* The Plaintiff does not explain handwritten notations in her affidavits, *see* Gale Aff. ¶¶ 61-62, and if she explained notations recording weekly hours at her deposition, those excerpts of the transcript have not been made part of the summary judgment record. *See* #78-2 ("Gale Depo. Tr.").

The City's "Payroll Register" rounds out documentary record of the hours that the Plaintiff worked and how much she was paid and when. It appears at #66-3. The City's Human Resources Director, Lisa Crowley, was deposed. If Crowley explained the payroll register at her deposition, those excerpts have not been made part of the record. *See* #78-9 ("Crowley Depo. Tr."); *see also* #55-3. The record does not include affidavits or deposition testimony from a payroll employee or vendor.

It is undisputed that based on the payroll register, from November 14, 2019, until the pay period covered by the Plaintiff's October 14, 2020, paycheck, the City paid the Plaintiff $18 an

hour for all of the hours she worked in a week, including for the hours in excess of 8 hours a day and 35 and 40 hours a week. *See* #66 ¶¶ 7-9; #76 ¶¶ 7-9; *see also* Gale Aff. ¶¶ 8-10.

Based on the payroll register, the Plaintiff received 21 paychecks between November 14, 2019, and October 14, 2020. Eight of those paychecks show or suggest more than 40 hours worked. A reasonable jury could find that 7 of those paychecks covered hours worked in a single week, rather than multiple weeks. One paycheck shows more than 35 but less than 40 hours worked. A reasonable jury could find that it covered hours worked in a single week, rather than multiple weeks. The Plaintiff was paid $18 an hour for all the hours that she worked in the 7 weeks in which she worked in excess of 40 hours and the week in which she worked in excess of 35 hours.

Thus, according to the payroll register, the March 4, 2020, paycheck was for 43 hours totaling $774; $774 divided by 43 hours is $18/hour. (#66-3 at 5.) A time sheet in the record shows 43 hours worked February 17-22, 2020. The Plaintiff signed this time sheet on February 22, and Hurtubise signed it on February 24. (#66-18 at 9.)[7] A reasonable jury could find from a comparison of the time sheet and payroll register that the March 4, 2020, paycheck covered the 43 hours worked February 17-22. Thus, a reasonable jury could find that the March 4, 2020, paycheck covered one week and was issued more than 6 days after the termination of the relevant pay period.

The March 11, 2020, paycheck was for 60 hours totaling $1,080; $1,080 divided by 43 hours is $18/hour. (#66-3 at 5.) A time sheet in the record shows 60 hours worked February 24-28, 2020. The Plaintiff and Hurtubise signed it on February 28. (#66-18 at 12.)[8] A reasonable jury

---

[7] The Plaintiff reported working 11 hours on the Wednesday of this week; 9 hours on Thursday; and 8.5 hours on Friday. *Id*.

[8] The Plaintiff reported working 10.5 hours each on the Monday and Tuesday of this week; 15 hours each on Wednesday and Thursday; and 9 hours on Friday. *Id*.

could find that the March 11, 2020, paycheck covered one week and was issued more than 6 days after the termination of the relevant pay period.[9]

The March 18, 2020, paycheck was for 44 hours totaling $792; $792 divided by 44 hours is $18/hour. (#66-3 at 5.) A time sheet in the record shows 44 hours worked March 2-6, 2020. The Plaintiff signed it on March 6. Hurtubise signed, but did not date, it. (#66-18 at 13.)[10] A reasonable jury could find that the March 18, 2020, paycheck covered one week and was issued more than 6 days after the termination of the relevant pay period.[11]

The September 2, 2020, paycheck was preceded by the August 19, 2020, paycheck, *see* #66-3 at 6, but a reasonable jury could find that it covered a single week, rather than multiple weeks.[12] According to the payroll register, the September 2, 2020, paycheck was for 65.5 hours

---

[9] The City occasionally has responded to the Plaintiff's statements of fact by asserting, unhelpfully, that the documents "speak for themselves" and that statements are not material because of its view of the applicable statute of limitations. *See*, *e.g.*, #78 ¶ 10. The court notes that although the City does not dispute that the payroll register shows no overtime paid in this period, it asserts that other records show that overtime was paid in this period. In particular, it cites the February 24-28, 2020, time sheet as showing that the Plaintiff was paid one and one-half times her straight-time wages, *i.e.* $27/hour, for 20 hours that week. (#78 ¶ 9.) The time sheet does not show that. It shows "60 x 18.75 = 1,125.00." (#66-18 at 10.) 40 hours times $18/hour plus 20 hours times $27/hour equals $1,260, not $1,125. Moreover, another copy shows $1,080 written below. *Id*. at 12. 60 hours times $18/hour equals $1,080.

[10] The Plaintiff reported working 8.5 hours on the Monday of this week and 18.5 hours on Tuesday. *Id.*

[11] The March 25, 2020, paycheck shows only 19 hours worked, but a time sheet in the record, signed by the Plaintiff and Hurtubise on March 11, shows that number of hours worked March 9-11, 2020, *compare* #66-3 at 5 *with* #66-18 at 14, thus a reasonable jury could find that this paycheck was issued outside the 6-day window. The Plaintiff reported working 9 hours on the Wednesday of this week. (#66-18 at 14.)

[12] When the Plaintiff asserts that the August "16," 2020, paycheck was issued outside the 6-day window, *see* #66 ¶ 64, presumably, she means the August 19 paycheck, *see* Gale Aff. ¶ 65; *see also* #66-3 at 5. While the August 19 paycheck does appear to have covered multiple weeks, the Plaintiff fails to acknowledge that she submitted a single time sheet for the hours worked in those multiple weeks, and that she did not do so until August 10. (#66-18 at 17-18); *see also* #66-18 at

totaling $1,179; $1,179 divided by 65.5 hours is $18/hour. *Id*. The time sheet in the record that shows 65.5 hours worked was signed by the Plaintiff but not dated; according to that time sheet, the hours were worked August 17-22, 2020, *see* #66-18 at 27,[13] meaning that a reasonable jury could find that the September 2, 2020, paycheck was issued outside the 6-day window.

For the September 9, 2020, paycheck, the payroll register does not specify a number of hours but $1,692 times 94 hours is $18/hour. (#66-3 at 6.) There are time sheets in the record showing 94 hours worked. They were signed by the Plaintiff and Hurtubise on September 2. As best the court can tell, the Plaintiff originally reported working the 94 hours August 16-22 and the September 9 paycheck was processed for the week ending August 22, but it was later determined that she actually worked the 94 hours August 23-29, and the September 9 paycheck should have been processed for the week ending August 29. *See* #66-18 at 28-30; *see also id*. at 19. Regardless, a reasonable jury could find that the September 9, 2020, paycheck was issued outside the 6-day window.[14]

According to the payroll register, the September 16, 2020, paycheck was for 83.5 hours totaling $1503; $1503 divided by 83.5 hours is $18/hour. (#66-3 at 6.) A time sheet in the record shows 83.5 hours worked August 30 to September 5, 2020. The Plaintiff and Hurtubise signed this

---

19 ("She was not paid for w/e 8/1 and 8/8/20 as those slips were just passed in last week with totals for respective weeks").

[13] The Plaintiff reported working 9.5 hours each on the Monday and Tuesday of this week; 12.5 hours each on Wednesday and Thursday; 9 hours on Friday; and 12.5 hours on Saturday. *Id*.

[14] The Plaintiff reported working 13 hours on the Sunday of this week; 14 hours each on Monday and Tuesday; 16 hours on Wednesday; 13 hours on Thursday; and 12 hours each on Friday and Saturday. *Id.* at 30.

time sheet on September 5. (#66-18 at 32.)[15] A reasonable jury could find that the September 16, 2020, paycheck covered one week and was issued outside the 6-day window.

The September 30, 2020, paycheck was for 46.5 hours totaling $837; $837 divided by 46.5 hours is $18/hour. (#66-3 at 6.) There is no time sheet in the summary judgment record that appears to correspond to this paycheck, *see* #66-18, but an inference that it covered one single week is supported by the fact that paychecks issued in the preceding and following weeks. (#66-3 at 6-7.)

Finally, according to the payroll register, the October 7, 2020, paycheck was for 39.5 hours totaling $711; $711 divided by 39.5 hours is $18/hour. (#66-3 at 7.) There is no time sheet in the summary judgment record that appears to correspond to this paycheck, *see* #66-18, but an inference that it covered one single week is supported by the fact that paychecks issued in the preceding and following weeks. (#66-3 at 7.)

2. <u>October 14 to November 25, 2020: Election Consultant; Overtime paid</u>.

According to the Plaintiff, starting with the October 14, 2020, paycheck, the City paid her $630 a week, on an hourly basis, and that "consistent with" the employee handbook, it also paid her one and one-half times her straight-time wages, i.e. $27/hour, for the hours that she worked in excess of 35 hours a week. (#66 ¶ 11-12.)

On page 11 of the employee handbook, an "***OVERTIME***" section stated:

> Overtime pay is granted in accordance with the Fair Labor Standards Act, as amended in 1985, whereby non-exempt full-time public employees who work more than 40 hours per week are eligible for compensation at the rate of time and a half. The City also pays time and a half for overtime to non-exempt employees whose normal workweek is 35 hours. Employees should consult collective bargaining agreements for any additional provisions. Employees should check paycheck stubs for accuracy and for occasional notices.

[15] The Plaintiff reported working 13 hours on the Sunday of this week; 15.5 hours on Monday; 20 hours on Tuesday; 12 hours on Wednesday; and 10 hours each on Thursday and Friday. *Id*.

(#78-15 at 4.)

Yet, on page 3, in what the court will call a "preamble," the handbook stated:

> The content of this Handbook has been prepared to provide both new and present City Employees with current and useful information regarding their employment. It is hoped that this publication will be a useful reference regarding the rights, privileges, and responsibilities of a career in City service. This Handbook is for reference only. Many union contracts may supersede portions of this Handbook.

*Id*. at 3.

There was also a "NOTICE" in the handbook:

> This Handbook and its contents do not constitute an employment contract and are provided for informational purposes only. All information contained herein is subject to change without notice. References to state and Federal laws are merely summaries and some provisions of the information as they affect conditions of employment are subject to change as interpreted by the courts. In addition, specific cases may require a different approach. Applicable collective bargaining agreements supersede provisions of this Handbook.

*Id*. at 5; *see also* #78-10 at 2.

As one exhibit, the City has submitted the preamble, overtime section, and a version of the notice that appears on page 31 and does not include a section for a signature and date. (#78-15 at 3-5.)

As a separate exhibit unaccompanied by any other page of the employee handbook, the City has submitted another version of the notice that appears on page 32 and does include a section for a signature and date. The Plaintiff appears to have completed this section, on October 27, 2021. (#78-10 at 2.) In signing, she "ACKNOWLEDGE[D] RECEIPT OF THIS HANDBOOK." *Id*.

Crowley testified that the Plaintiff "would have been handed the policies and procedures of the City along with a handbook upon orientation of hire" and that in reviewing files, she (Crowley) found "some sheets that say I received policies and procedures." Crowley was "not sure if [the sheets] state[d] which policies and procedures, but usually it's all crumped together in one

book." Crowley Depo. Tr. at 36-37 (#78-9 at 5-6).

The Plaintiff attests that she first received the employee handbook in 2013 or 2014, *see* Gale Supp. Aff. ¶ 5, and indeed, Crowley testified that the 2019 version was "a rewrite of something that was done earlier." Crowley Depo. Tr. at 37 (#78-9 at 6). The Plaintiff does not attest to the content of the employee handbook she received in 2013 or 2014 and does not attest to receiving copies of the 2019 version or an earlier version between 2013 or 2014 and October 27, 2021. *See* Gale Supp Aff. ¶ 5.

The City does not dispute that on October 14, 2020, it started paying the Plaintiff $630 a week. The City does dispute that it paid her $630 a week on an hourly basis, as the Plaintiff asserts. (#76 ¶ 11).

The City does not dispute that from October 14 to November 25, 2020, it paid the Plaintiff $27/hour for the hours that she worked in excess of 35 hours a week. *Id.* ¶ 12. The City does dispute that this was "required" by the employee handbook.

According to the City, effective October 14, 2020, the Plaintiff's Election Consultant position was classified as "salaried, non-exempt" and the City paid the Plaintiff $630 a week for all of the hours that she worked up to 40 hours a week plus $27/hour for the hours that she worked outside of her regular shifts during the busy election season, August to November. (#76 ¶¶ 11-12).[16]

[16] There is no apparent dispute that at least by the pay period covered by the November 10, 2020, paycheck, the Plaintiff typically worked from 8:30 AM to 4:30 PM on Mondays, Tuesdays, and Thursdays; from 8:30 AM to 7:30 PM on Wednesdays; and, from 8:30 AM to 12:30 PM on Fridays. (#66 ¶ 47; #76 ¶ 47); *see* Gale Aff. ¶ 47. That adds up to 39 hours. The Plaintiff asserts that the City treated those 39 hours as 35 hours by "automatically deducting" one-hour lunch breaks from the Monday, Tuesday, Wednesday, and Thursday shifts. *See* #62 ¶ 9; #66 ¶ 48; *see also* Gale Aff. ¶ 48. The City disputes this. (#76 ¶ 48). For purposes of summary judgment, the City does not dispute the Plaintiff's assertions, *see* #66 ¶¶ 50-51; *see also* Gale Aff. ¶¶ 50-51, that

Thus, Nazarian attests that effective October 14, 2020, the Mayor appointed the Plaintiff to the Election Consultant position which was classified as "salaried, non-exempt" and it paid her $630 a week for all of the hours that she worked up to 40 hours a week and she was eligible to collect overtime wages. (#77 ¶ 4). Nazarian adds that it is her understanding that Hurtubise obtained grant funding and used it to pay the Plaintiff $27/hour for the hours that she worked outside of her regular shifts during the busy election season, which typically ran from August to November. *Id*. The summary judgment record does not include such documents as a job posting for the Election Consultant position or any letter that the Mayor might have sent the Plaintiff confirming her appointment.

The City's assertion that effective October 14, 2020, the Plaintiff's Election Consultant position was classified as "salaried" and that the $630 a week was intended to cover all of the hours that she worked up to 40 hours in a week is inconsistent with a prior statement of the City's former Human Resources Director, who wrote to the Plaintiff on March 16, 2022:

> …Prior to November 1, 2021, the effective date you started as the Elections Coordinator, to the best understanding of Human Resources, you worked on an hourly basis as needed in the Clerk's Office with duties primarily in the Voter Registration Office and your hours regularly increased around election time as your primary duties were to support the current Clerk Adam Hurtubise as well as the prior Clerk Edward Finn…

(#66-6 at 2.)

A review of the payroll register confirms that during this period, the Plaintiff was paid $630 a week plus $27/hour, or more, for some hours worked. Thus, the payroll register entry for the October 14, 2020, paycheck shows "Overtime" earnings for 13 hours, for $351, i.e. $27/hour, and

---

she worked through lunch breaks and before and after her shifts, *see* #76 ¶¶ 50-51. However, it asserts that at any trial, it would be able to prove that the Plaintiff took lunch breaks. *Id*. ¶ 50.

"Regular" earnings for 35 hours, for $630. (#66-3 at 7.)

The register shows two paychecks dated October 21, 2020. The first shows "Overtime" earnings for 13 hours, for $351, i.e. $27/hour, and "Regular" earnings for 35 hours, for $630. The second shows "Overtime" earnings for 5 hours, for $135, i.e. $27/hour; "Overtime" earnings for 27 hours, for $810, which is $30/hour, not $27/hour; "Regular" earnings for 35 hours, for $630; and "Regular" earnings for another 35 hours, for another $630. *Id*.

The entry for the October 28, 2020, paycheck shows "Overtime" earnings for 23.5 hours, for $634.50, i.e. $27/hour, and "Regular" earnings for 35 hours, for $630. *Id.*

The entry for the November 4, 2020, paycheck shows "Overtime" earnings for 44.5 hours, for $1,201.50, i.e. $27/hour, and "Regular" earnings for 44.5 hours, for $630. *Id.* at 8.

The entry for the November 10, 2020, paycheck shows that the Plaintiff was paid "Overtime" earnings for 41 hours, for $1,107, i.e. $27/hour, and "Regular" earnings for an unspecified number of hours but $630. *Id*.

The entry for the November 18, 2020, paycheck shows that the Plaintiff was paid "Overtime" earnings for 43.5 hours, for $1,174.50, i.e. $27/hour, and "Regular" earnings for an unspecified number of hours but $630. *Id*.

Finally, the entry for the November 25, 2020, paycheck shows "Overtime" earnings for 2.5 hours, for $67.50, i.e. $27/hour, and "Regular" earnings for an unspecified number of hours but $630. *Id.*

3. <u>December 2, 2020, to July 28, 2021:</u><br><u>Election Consultant; No overtime paid</u>.

The payroll register entries for the paychecks dated December 2, 2020, to July 28, 2021, with three exceptions, show that the Plaintiff was paid $630. *See* #66-3 at 8-14. The three exceptions are as follows: The entry for the paycheck dated December 23, 2020, shows that the

Plaintiff was paid $252 for an unspecified number of "Regular" hours, *see id*. 9; the entry for the March 31, 2021, paycheck shows that she was paid $558 for an unspecified number of "Regular" hours, *see id*. at 11; and the entry for the May 12, 2021, paycheck shows that she was paid $630 for an unspecified number of "Regular" hours and then $80 for 4 more "Regular" hours, *see id*. at 12.

The Plaintiff asserts that after the paycheck dated November 25, 2020, until the paycheck dated August 4, 2021, the City "reverted" to paying her straight-time wages even when using the "Overtime" code on the payroll register. *See* #66 ¶¶ 13-14; *see also* Gale Aff. ¶¶ 14-15; *contrast*, *e.g.*, #66-3 at 10 ("Regular" code used for March 3, 2021, paycheck totaling $630); *id*. at 11 ("Overtime" code used for March 10, 2021, paycheck totaling $630).

The City does not dispute what the payroll register shows; relying on Nazarian's affidavit, the City disputes that it was paying the Plaintiff on an hourly basis. *See* #76 ¶¶ 11, 13-14.

4. August 4 to November 1, 2021: Election Consultant; Overtime paid.

The Plaintiff asserts, and the City does not dispute, that starting with her paycheck dated August 4, 2021, the City again paid her $27/hour for the hours that she worked in excess of 35 hours a week. (#66 ¶ 13; #76 ¶ 13); *see* Gale Aff. ¶ 15. And the payroll register shows that until the November 3, 2021, paycheck, with one exception, the Plaintiff was paid either $630 or $630 plus varying amounts at $27/hour.[17] The entry for the September 22, 2021, paycheck shows that she was paid $630 plus $702, for 20 hours, *see id.* at 15, which is $35.10/hour.

[17] *See* #66-3 at 14-16 (August 4, 2021: $630 plus $108, for 4 hours; August 11, 2021: $630; August 18, 2021: $630; August 25, 2021: $630 plus $40.50, for 1.5 hours; September 1, 2021, $630 plus $108, for 4 hours; September 8, 2021: $630 plus $13.50, for 0.5 hours; September 15, 2021: $630; September 29, 2021: $630 plus $1,242, for 46 hours; October 6, 2021: $630; October 13, 2021: $630 plus $162, for 6 hours; October 20, 2021: $630 plus $324, for 12 hours; October 27, 2021: $630 plus $459, for 17 hours; November 3, 2021: $630 plus $540, for 20 hours).

5. <u>November 1, 2021, to October 26, 2022: Election Coordinator; No overtime paid</u>.

Starting with the November 10, 2021, paycheck, until her last paycheck, dated October 26, 2022, the City paid the Plaintiff $1,222 a week, never less. All entries on the payroll register include "0.00" for the number of hours worked. (#66-3 at 16-25.)

The Plaintiff attests that her personal calendars show that after November 1, 2021, she "regularly" worked in excess of 35 and 40 hours a week and in excess of 8 hours a day, especially in election season. Gale Aff. ¶ 62; *see* #66 ¶ 61. The City does not dispute that effective November 1, 2021, the Plaintiff was no longer eligible to collect overtime wages. (#76 ¶ 61.)

Effective November 1, 2021, the Plaintiff held the "Election Coordinator" position. That position was created and funded in early summer 2021, and in the job posting, the City described it as "Non-Union FLSA Exempt." The City listed a salary range of $1,222 to $1,455.39 a week. The Plaintiff applied for the position in the middle of the summer 2021, and in the fall, the Mayor confirmed her appointment. *See* #66 ¶¶ 15-16; #76 ¶¶ 15-16; *see also* Gale Aff. ¶¶ 16-17; #78-3 (Election Coordinator job posting).

According to the job posting, the hours of work for the Election Coordinator were "Full-time (35 hours/weekly)," Monday, Tuesday, and Thursday from 8:30 AM to 4:30 PM, Wednesday from 8:30 AM to 7:30 PM; and Friday from 8:30 AM to 12:30 PM, as well as evenings and weekends as needed. (#78-3 at 2.) The Election Coordinator would work under the direct supervision of the City Clerk and would supervise staff within the Registrars of Voters Office. *Id.* In the job posting, the "Basic Function" of the position was described as performing complex and difficult technical elections work, including supervising Registrars of Voters Office staff and overseeing the hiring, training, and work of poll workers; planning, organizing, and directing the overall operation of the City's municipal, state, and federal elections, including budget preparation

and administration; and, ensuring that the City meets legislative and regulatory requirements for elections. *Id*.

6. The Plaintiff's tasks as Election Consultant versus Election Coordinator.

The Plaintiff asserts that as the Election Consultant and Coordinator, her "core" activities were the same. (#66 ¶ 19); *see* Gale Aff. ¶ 20; *accord* Gale Aff. ¶ 55. She identifies the "core" activities that "defined the role and consumed the majority of her working time" as recruiting, training, and scheduling poll workers,[18] processing voter registrations and ballots,[19] and setting up polling places.[20] (#66 ¶ 20); *see* Gale Aff. ¶ 21.

---

[18] This included distributing applications, reviewing them for accuracy and completeness; verifying applicants' eligibility to work at the polling locations; conducting background checks; maintaining detailed logs of applicant status and work history in a poll worker database; scheduling shifts based on availability and precinct needs under Massachusetts election law; conducting mandatory training sessions for poll workers using state-issued training materials and legal guidance from the Massachusetts Secretary of State; preparing and distributing training materials; providing step-by-step instructions on voter check-in procedures, use of poll books and ballot scanners, and handling provisional ballots; and covering election security requirements, including chain of custody procedures for ballots and official election materials. (#66 ¶ 20); *see* Gale Aff. ¶ 21.

[19] This included entering new voter applications and updates into the state voter registration database; verifying proof of residency; checking for duplicate registrations in the state database; processing name, address, and party affiliation changes; reviewing and processing mail-in ballots, verifying voter signatures, and ensuring each envelop was properly signed and dated before logging the ballot; comparing voter signatures against registration files to confirm identity and checking for missing or incomplete information; following state procedures to notify voters of issues or flagging ballots for further review; sorting ballots into designated batches for counting and securing storing them for transport; and assisting with post-election reconciliation by cross-checking the number of ballots cast against voter logs. (#66 ¶ 20); *see* Gale Aff. ¶ 21.

[20] This included assembling voting booths and arranging them to ensure voter privacy; setting up Americans with Disabilities Act compliance points; unpacking, testing, and calibrating voting machines and recording test results; setting up ballot boxes and secure storage containers; arranging tables, chairs, and voter check-in stations; and, on election days, confirming that each location had the required ballots, voting pens, privacy folders, and emergency ballot pins before the polls opened. (#66 ¶ 20); *see* Gale Aff. ¶ 21.

The City does not dispute that the Plaintiff oversaw recruiting, training, and scheduling poll workers, processing voter registrations and ballots, and setting up polling places. Rather, it disputes that these were her "core" activities and that her activities were the same as Election Consultant and Coordinator. (#76 ¶¶ 19-20.) The City argues that the Plaintiff's affidavits (and Nunley Benjamin's) disclaiming responsibilities as the Election Coordinator contradict her prior testimony and the documentary record. *See id.*; *see also* #85 at 1-2.

As evidence of the Plaintiff's actual activities as the Election Coordinator, the City relies heavily on Nazarian's affidavit. Nazarian attests that as the Election Coordinator, the Plaintiff

> was responsible for overseeing the Registrar of Voters Office. In this role, she was responsible for managing the budget for the Registrar of Voters Office, presenting to the Board of Registrars on activities of the office, serving as the primary point of contact between the City and the Secretary of State's Office, and overseeing office staff, both temporary and full time.

(#77 ¶ 5.) [21]

There is no dispute that the Plaintiff supervised poll workers. Her self-identified "core" activities consuming the "majority of [her] working time" included recruiting, training, and scheduling poll workers. Gale Aff. ¶ 21. She also admitted at her deposition that she supervised poll workers. Gale Depo. Tr. at 80-81 (#78-2 at 9-10).[22]

The Plaintiff now denies that she had the authority to hire and fire poll workers; she asserts

[21] Apart from Nazarian's affidavit, there is little evidence that the Plaintiff "present[ed] to the Board of Registrars on activities of the office." The Plaintiff attests in her supplemental affidavit that she appeared before the Board once to answer questions about the denial of one provisional ballot. Gale Supp. Aff. ¶ 13.

[22] Regarding training generally, the court notes the Plaintiff's DLR hearing testimony: Gale DLR Tr. 25-26 (#78-1 at 4-5) ("When I first started as elections coordinator…, in the registrar of voter's office, … I was responsible for training all people that worked elections. At the time, there were 96 of them. …"); *id*. at 40 (#78-1 at 6) (she trained "[a]ll the time" and "thousands"); *id*. at 63 (#78-1 at 9) ("as elections coordinator, I hired poll workers, trained poll workers").

that the authority belonged to Hurtubise. Gale. Aff. ¶ 36. But she testified at the DLR hearing that she hired poll workers. Gale DLR Tr. at 63 (#78-1 at 9); *see also* #78-8 at 2 (flyer advertising poll worker position listing the Plaintiff as the point of contact). She testified at her deposition that she oversaw hiring. Gale Depo. Tr. at 80-81 (#78-2 at 9-10). She further testified that she fired two poll workers:

> Q. And as the election coordinator, you were called in to assist with de-escalating that situation, correct?
>
> A. Yes.
>
> Q. And as a result of that incident, you terminated both of those poll workers, correct?
>
> A. Absolutely.

*Id*. at 109 (#78-2 at 25).

The Plaintiff also testified that as the Election Consultant, she made a recommendation as to a poll worker's ability to serve to Hurtubise or the Board and Hurtubise or the Board took her recommendation:

> Q. Did you ever have a circumstance where you were in a discussion with [the Board] or [Hurtubise] and said, I don't think this person should be a poll worker; they were under the influence of alcohol; I have concerns they would not be a good poll worker?
>
> Were you ever in that position during the entire time you worked as an election consultant?
>
> A. That I witnessed something personally?
>
> Q. Correct. And communicated it to --
>
> A. Yes.
>
> Q. And did [the Board] or Mr. Hurtubise take your recommendation?
>
> A. Yes.

*Id*. at 73-74 (#78-2 at 7-8).

On the other hand, the Plaintiff has consistently denied that she supervised the Registrars of Voters Office staff, which, she asserts, was Hurtubise's responsibility. *See* Gale Depo. Tr. at 87 (#78-2 at 16); *see also* Gale Aff. ¶ 37; Gale. Supp. Aff. ¶¶ 11, 27. The City urges a contrary finding, *see* #76 ¶ 36, relying on Nazarian's affidavit, *see* #77 ¶ 5, and the Plaintiff's deposition testimony that Hurtubise gave a verbal warning to one staff member for wearing business clothing instead of casual clothing when the staff member was supposed to help clean a vault, and the Plaintiff delivered that warning. Gale Depo. Tr. at 155-56 (#78-2 at 43-44).

Nazarian's affidavit provides support for a finding that even if the Plaintiff did not supervise the Registrars of Voters Office staff, she trained them. Nazarian attests that the Plaintiff prepared a booklet meant to train poll workers and permanent staff on compliance expectations. (#77 ¶ 6.) The Plaintiff does not deny that she prepared the booklet to train poll workers and permanent staff on compliance expectations, but she attests that the booklet contained procedures set out by state law and officials, and she did not create the law or change the procedures. Gale Supp. Aff. ¶ 15.[23] There is no dispute that the Plaintiff was required to follow Massachusetts election law, which uses mandatory language, and that the Secretary of State issues detailed, mandatory guidelines for municipal officials. (#66 ¶¶ 21-22, 24-26; #76 ¶¶ 21-22, 24-26); *see* Gale Aff. ¶¶ 21-26.

[23] During her DLR hearing testimony, the Plaintiff described training Election Commission members. *See* Gale DLR Tr. at 41 (#78-1 at 7) ("I had to instruct them on what their job duties and responsibilities were. I had to instruct them -- Commissioner Milorin had been a warden for me. He came on as a warden in 2019. So I had trained him to be a warden in a polling location. So he had a a little bit of familiar -- familiarity with how that side of the elections work. It was a little easier for him. The other commissioners had no experience whatsoever. So it was all about making sure that they understood what the process was, that there were laws that we had to answer to and time lines and time frames that you have to work in those parameters").

There is no dispute that the Plaintiff was responsible for ensuring compliance with Massachusetts election law. *See* Gale Depo. Tr. at 87 (#78-2 at 16); *see also* #78-4 at 2 (the Plaintiff's June 28, 2022, email to the Mayor and Nazarian: "…As you know this is a statutory requirement under Chapter 51 Section 37 if we fail to do this we will be in violation of the law. (again)…").

There is also no dispute that the Plaintiff was the City's point of contact with the Massachusetts Secretary of State. She admitted as much at her deposition, *see* Gale Depo. Tr. at 88 (#78-2 at 17), and at the DLR hearing, she testified that she worked "very closely" with the Secretary of State and his office. She also testified to the importance of such a relationship. Gale DLR Tr. at 42 (#78-1 at 8).

The Plaintiff has consistently denied that she prepared the election budget; that authority, she asserts, belonged to Nunley Benjamin. *See* Gale Depo. Tr. at 81 (#78-2 at 10); *see also* Gale Aff. ¶ 34; Gale Supp. Aff. ¶¶ 12, 22-24, 27.[24] Yet, during her deposition, the Plaintiff acknowledged that she was asked by the Assistant Finance Director, Tyler Lavalle, to go over the election budget with him, which she did. She also acknowledged that Nazarian asked her to make

[24] At the DLR hearing, the Plaintiff testified that her tasks as Election Coordinator and the Election Manager were "almost identical," *see* Gale DLR Tr. at 40 (#78-1 at 6), confirming that it was "fair to say that they were essentially the same position with a different title and different pay," see id. at 63 (#78-1 at 9). But she also described the "biggest different" between the two positions as "the budgeting aspect," explaining that as the Election Manager, "you were now solely responsible as a department head for creating your budget. Those were the biggest differences. Everything else was still the same." *Id*. at 64 (#78-1 at 10). The Mayor at the DLR hearing described the work of the Election Coordinator and Manager as "similar" but the "structure and pay" as "different." Mayor DLR Tr. at 173 (#66-2 at 62). Nazarian testified that the Coordinator "didn't have the level of responsibility" that the Manager had, because the Manager had "ultimate responsibility as to elections versus someone else having the ultimate responsibility…" Nazarian DLR Tr. at 111 (#66-2 at 47). The Manager was a department head and the Coordinator was not. *Id.*

recommendations on the election budget, which she did. Gale Depo. Tr. at 82-83 (#78-2 at 11-12); *see also* #66 ¶ 34; #76 ¶ 34.

There are emails in the record confirming that the Plaintiff was asked to, and did, make recommendations on the election budget. Thus, at 9:18 PM on June 15, 2022, Nazarian wrote to the Plaintiff, in part:

> …While the Department Head position in Elections is still technically vacant, as a courtesy, I am sending you the semi-final budget sheet for the Elections Department to go out to the City Council. Could you please review tomorrow and let me know if you have any questions or concerns? I plan to transmit the budget to the City Council at the end of the day tomorrow.

(#78-6 at 2.) The Plaintiff responded ten minutes later, stating that she would review the semi-final budget first thing in the morning. *Id*.

At 9:25 AM on June 16, Lavalle sent the Plaintiff, copying Nazarian, "the updated elections budget with the correction to the Personnel Services Summary." (#66-11 at 2.)

After noon on June 16, the Plaintiff sent her suggestions to Nazarian, proposing that certain proposed expenditures be eliminated and why: $3,000 for professional training as "any vendor we use provides training for free as part of the contract"; $2,450 for advertising because "[h]ave never used this line item"; and, $2,000 for "Acct 5860 Office Supplies" as "[t]his was built in as a safety net for the new Poll Pads but they are covered under warranty and we will not need it." She also made suggestions for a staffing level change. (#78-7 at 2.)

Nazarian responded about an hour later, setting out her understanding of the Plaintiff's suggestions, and stating that she was "copying Tyler [Lavalle], so that once your response comes in, we can make the nece[s]sary changes." *Id*.

About thirty minutes later, the Plaintiff responded to Nazarian alone and indicated that her understanding of the Plaintiff's suggestions was correct:

> That is correct. As long as it is the position that I asked to keep. It still would be 3 fulltime positions and 1 temporary part time at election time. Thank you for considering my suggestions in a time when EVERYONE needs to pitch in and do their level best this is a way for the Elections Department to help tow that line.

*Id*. at 3.

The Plaintiff also acknowledged at her deposition that she made a presentation to the City Council on the election budget. Gale Depo. Tr. at 86 (#78-2 at 15). She asserts that the presentation was not "budget preparation" because the City Council asked her to give it. *Id*.

The City relies heavily on two statements, one by the Plaintiff and the other by Hurtubise. There is no dispute that the Plaintiff admitted at her deposition that she told the Mayor that as the Election Coordinator, she was "providing all the functions of" an election department head. *See* Gale Depo. Tr. at 97-98 (#78-2 at 19-20).

The City asserts that Hurtubise deferred to the Plaintiff. (#76 ¶ 71.) In support, it submits Board meeting notes indicating that Board members saw Hurtubise walk into a room "in a high state of emotion" and declare: "*I relinquish all my voting responsibilities to Sandy*," before walking out. (#78-13 at 5.)[25]

The Plaintiff denies that Hurtubise deferred to her, claiming that he was the City Clerk and thus the City's chief election official and that he was responsible for supervising the Registrars of

---

[25] The City also submits a letter from Board members opposed to a full-time "Election Supervisor" position, which they saw "mainly as a means to hire [the Plaintiff], currently a part time employee, to perform [Hurtubise's] duties." They set out criticisms of the Plaintiff, including that she has "no special knowledge or management skills that would recommend her for this position" and that "[u]nder her direction," training of poll workers had been inadequate. *Id*. at 3. They also set out criticisms of Hurtubise, including that he has "shown little interest in providing the leadership needed to correct these deficiencies" and has "relinquished all of his election responsibilities to [the Plaintiff] and routinely defers inquiries and decision making to her." *Id*. at 4.

In addition, the City submits Hurtubise's recommendation of the Plaintiff for the Election Coordinator position. (#78-14 at 4-5.) Hurtubise wrote in part that the Plaintiff had "long been an indispensable, mission-critical member of our team." *Id*. at 4.

Voter's Office staff, including hiring, disciplining, and firing them. (#84 ¶ 71.) The Plaintiff was not present when Hurtubise declared: "*I relinquish all my voting responsibilities to Sandy*" and she denies that he ever made such a statement to her. Gale Supp. Aff. ¶ 20.

V. Discussion.

The court first addresses the Plaintiff's claims that do not depend on a determination of whether she was exempt from the FLSA's overtime requirements. The court then addresses her exempt status.

A. Late Payments (Count VII).

The Massachusetts Wage Act states, in relevant part:

> Every person having employees in his service shall pay weekly or bi-weekly each such employee the wages earned by him to within six days of the termination of the pay period during which the wages were earned if employed for five or six days in a calendar week, or to within seven days of the termination of the pay period during which the wages were earned if such employee is employed seven days in a calendar week, or in the case of an employee who has worked for a period of less than five days…shall, within seven days after the termination of such period, pay the wages earned by such casual employee during such period…

Mass. Gen. Laws ch. 149, § 148. Payments violate Mass. Gen. Laws ch. 149, § 148 if they are made late. *See Reuter v. City of Methuen*, 489 Mass. 465, 466, 471 (2022) (involving a payment for accrued vacation time that was made a few weeks after discharge, rather than on the day of discharge as required). To succeed on a claim under Mass. Gen. Laws ch. 149, § 148, a plaintiff must show that she was an employee under the Massachusetts Wage Act; her form of compensation constituted wages under the Act; and the defendant violated the Act by not paying her wages in a timely manner. *See McGrath v. City of Somerville*, 419 F. Supp. 3d 233, 256 (D. Mass. 2019).

Count VII clearly asserts claims based on the failure to pay overtime wages earned under Mass. Gen. Laws ch. 149, § 33B, and the employee handbook. *See* #62 ¶¶ 72-75; *see also* #38 ¶ 1 (first motion to amend); #54 ¶ 16 (second motion to amend). Yet Count VII also asserts a claim

based on late payments of earned wages, including straight time. *See DiFronzo v. City of Somerville*, --- F.4th ----, 2026 WL 2824054, at *8 (1st Cir. 2026) ("a pleading asserting a claim need only provide 'a short and plain statement of the claim showing that the pleader is entitled to relief.'… And a court construing a complaint should do so 'generously, paying more attention to substance than to form'") (first quoting Fed. R. Civ. P. 8(a)(2), then quoting *Rodriguez v. Doral Mortg. Corp.*, 57 F.3d 1168, 1171 (1st Cir. 1995)); *see* Fed. R. Civ. P. 8(e) ("Pleadings must be construed so as to do justice"). The count is captioned as a claim for the "Failure to Make Timely Payment of Earned Wages and Wages Due under" Mass. Gen. Laws. ch. 149, § 33B, and in the count, the Plaintiff asserts that the Massachusetts Wage Act required the City to pay her wages within 6 days of the termination of the pay period in which she earned them and covers straight time and any additional wages. *See* #62 at 10 and ¶ 71. The court disagrees with the City that Count VII is a "pile on" count that survives summary judgment only if overtime wage counts survive summary judgment. *See* #75 at 18.

Anticipating that the court would reject its "pile on" characterization, the City alternatively disputes that the cited records show late payments. (#75 at 18); *see also* #76 ¶ 64.[26] First, the court agrees with the City that the Plaintiff's reliance on its "practice" of paying overtime wages one week in arrears is unpersuasive. The "practice" was not universal. *See* Crowley Depo. Tr. at 23 (#78-9 at 3) ("some employees…were paid" in a timely manner). Second, the Plaintiff asserts that the August 19, 2020, paycheck was issued outside the 6-day window, *see* #66 ¶ 64; *see also* Gale

[26] This is the only other argument the City makes regarding Count VII. It has abandoned the statute of limitations argument. *Contrast* #76 ¶ 64 *with* #75 at 18. It suffices to say that the Massachusetts Wage Act imposes a three-year statute of limitations, *see* Mass. Gen. Laws ch. 149, § 150, and claims based on paychecks from 2020 would be timely had they been made in the original complaint, filed in 2022. "Relation back" is a viable argument as to Wage Act amendments. *See Trindade v. Grove Srvcs., Inc.*, 91 F.4th 486, 494-95 (1st Cir. 2024) (discussing relation back of amendments in Wage Act context).

Aff. ¶ 65, but from all that appears, the Plaintiff herself caused the delay, *see* #66-18 at 17-19.

But, as set out in detail above, a reasonable jury could find from a comparison of the payroll register entries and the corresponding time sheets that paychecks were issued outside the 6-day window. The City has not offered a contrary interpretation of the records cited or the law. The court therefore grants summary judgment on liability for the Plaintiff on so much of Count VII that is a claim based on late payments.

B. Failure to Pay "Off-the-Clock Work" (Count V).

As noted above, Count V asserts claims under Mass. Gen. Laws ch. 149, § 148, for the failure to pay "off-the-clock work" before and after the Plaintiff's scheduled shifts and during lunch breaks. (#62 ¶¶ 52, 56-57.) In their briefing, neither party addresses the pre- and post-shift work claim.

The City argues that as of October 14, 2020, it was paying the Plaintiff a salary intended to compensate up to 40 hours a week, therefore, the allegedly "automatically deducted" lunch breaks were compensated. Similarly, as of November 1, 2021, the City was paying the Plaintiff a salary and her lunch breaks were compensated. (#75 at 15-16.)

The City does not cite any, but there is law that arguably supports the proposition that for salaried employees, lunch breaks are considered paid breaks because of the inference that the salary is equally apportioned over the day. *See Duncan v. Workers' Comp. Appeals Bd.*, 150 Cal. App. 3d 117, 121 (1983) ("particularly in view of the liberal policy of the workers' compensation law"); *but see Lawrence v. Sch. Committee of Somerset*, 104 Mass. App. Ct. 1113, *2 n.7 (2024) (unpublished) (Massachusetts Wage Act case; explicitly declining to consider argument based on *Duncan* and like cases).

The City is not entitled to judgment as a matter of law; neither is the Plaintiff. There is a

genuine factual dispute whether, between October 14, 2020, and November 1, 2021, the City was paying the Plaintiff a salary intended to compensate up to 40 hours a week. Nazarian's claim that the City was, *see* #77 ¶ 4, is inconsistent with its former Human Resource Director's prior statement that until November 1, 2021, the Plaintiff "worked on an hourly basis," *see* #66-6 at 2.

Moreover, per the payroll register, twice in this period, the Plaintiff was paid less than $630 a week. *See* #66-3 at 9 (December 23, 2020, paycheck for $252, which would be 14 hours at $18/hour); *id*. at 11 (March 31, 2021, paycheck for $558, which would be 31 hours at $18/hour). This, too, supports a finding that she "worked on an hourly basis" and was not paid a salary intended to compensate up to 40 hours a week.

The evidence that the Election Coordinator position was salaried and that the salary was apportioned and compensated lunch breaks is much stronger. The Election Coordinator job posting advertised a salary range -- $1,222 to $1,455.39. (#78-3 at 2.) As the Election Coordinator, the Plaintiff was paid an amount within that range -- $1,222, and she was never paid less. *See* #66-3 at 16-25. The payroll register entries after November 1, 2021, do not specify a number of hours worked or hourly rate, *see id*., supporting a finding that she was paid a salary intended to compensate lunch breaks, and not hourly.

However, the Election Coordinator was expected to work shifts totaling 39 hours a week, and the City nevertheless advertised the position as "Full-time (35 hours/weekly)." (#78-3 at 2.) Furthermore, the Plaintiff was paid a salary at the very bottom of the advertised range. Given these facts, a reasonable jury could infer that the salary compensated lunch breaks, or not.

C. <u>The Failure to Pay Overtime Wages for Hours Worked in Excess of 8 Hours a Day and 40 Hours a Week under Mass. Gen. Laws ch. 149, § 33B (Count IV)</u>.[27]

[27] As noted, Count VII is also a Mass. Gen. Laws ch. 149, § 148, claim based on the failure to pay overtime wages under Mass. Gen. Laws ch. 149, § 33B. *See* #62 ¶¶ 72-75.

As relevant to Count IV, Mass. Gen. Laws ch. 149, § 33B provides that for employees of cities and towns that have "accepted" this statute,[28] service must be restricted to 40 hours in a week and 8 hours in a day

> provided, that service in excess of the days and hours aforesaid may be authorized by an officer of such city or town or by any other person whose duty it is to employ, direct or control such employees, and such additional service shall be compensated for as overtime.

*Id*. The statute explicitly does not apply

> to policemen, firemen, school teachers, incumbents of offices specifically established by or under the authority of any general law or special act, or such other classes or groups of employees as from time to time may be specifically exempted therefrom in the manner provided for the acceptance of this section.

*Id*.

The City argues that Count IV fails because Mass. Gen. Laws ch. 149, § 33B, cannot be privately enforced, *see* #75 at 14, and regardless, the Plaintiff was an "incumbent[] of office[] specifically established by or under the authority of" Mass. Gen. Laws ch. 54, § 11, *see* #75 at 13-14, and the City did not require "additional service" within the meaning of Mass. Gen. Laws ch. 149, § 33B, *see* #75 at 14-15. The third argument has some merit; the first and second do not.

1. Private enforcement.

The Massachusetts Supreme Judicial Court ("SJC") in *Sutton v. Jordan's Furniture, Inc.*, 493 Mass. 728 (2024), rejected a private-right-of-action argument as to Mass. Gen. Laws ch. 136, § 6(50), the "Sunday pay" statute, which like Mass. Gen. Laws ch. 149, § 33B, does not expressly provide a private right of action and is not listed among the statutes that can be enforced under the

---

[28] It is undisputed for the purposes of summary judgment that on October 3, 1959, the City "accepted" the statute. (#66 ¶ 65; #76 ¶ 65); *see* Gale Supp. Aff. ¶ 28; #84-1; *cf*. #86 ¶ 81.

Massachusetts Wage Act's private right of action. *Sutton*, 493 Mass. at 739.[29] The SJC reasoned that Mass. Gen. Laws ch. 149, § 148, is listed among the statutes that can be enforced under the Wage Act's private right of action, provides that "[e]very person having employees in his service shall pay weekly or biweekly each such employee the wages earned by him," and applies to all wages earned, including those prescribed by statute. *Id*. at 739-40 (quoting Mass. Gen. Laws ch. 149, § 148, then citing *Drive-O-Rama, Inc. v. Attorney Gen*., 63 Mass. App. Ct. 796, 769-70 (2005)). The SJC continued:

> When an employee works on a Sunday, he or she earns Sunday pay pursuant to [§ 148 of the Wage Act]; therefore, a Sunday pay violation is also a violation of § 148 of the Wage Act. In turn, an employee can bring an action to recover for Sunday pay violations under the Wage Act's private right of action.

*Id*. at 740.

The Plaintiff argues that overtime pay under Mass. Gen. Laws ch. 149, § 33B, is an earned wage to which Mass. Gen. Laws ch. 149, § 148, and thus the Wage Act's private right of action, applies, just as Sunday pay under Mass. Gen. Laws ch. 136, § 6(50), is an earned wage to which Mass. Gen. Laws ch. 149, § 148, and thus the Wage Act's private right of action, applies. (#83 at 6.) The City does not argue that overtime pay under Mass. Gen. Laws ch. 149, § 33B, is not an earned wage like Sunday pay. Rather, the City argues that the SJC in *Sutton* assumed that the Sunday pay statute applied to the plaintiffs and here it is disputed whether § 33B applied to the Plaintiff. (#85 at 5.) But whether § 33B applied to the Plaintiff is a different question than whether she can privately enforce it. Extending *Sutton*, she can.

2. <u>The incumbent of statutory office exemption</u>.

---

[29] The Act's private right of action lists Mass. Gen. Laws ch. 149, §§ 33E, 52E, 148, 148A, 148B, 148C, 150C, 152, 152A, 159C, 190 and Mass. Gen. Laws ch. 151 § 19. *See* Mass. Gen. Laws. ch. 148, § 150.

Mass. Gen. Laws ch. 54, § 11, addresses the timing of the annual appointment and number of "wardens," "deputy wardens," "clerks," "deputy clerks," "inspectors," and "deputy inspectors" at polling locations on election days. *See id*. The duties of wardens, clerks, and inspectors are set out in 950 C.M.R. §52.01. *See Lyons v. Secretary of Commonwealth*, 490 Mass. 560, 582, n.26 (2022). A warden is "the chief election officer at the polling place" who supervises the other election officers before the polls open, during the election, and during the vote count. The warden is responsible for maintaining order and handling violations of election law. 950 C.M.R. §52.01(3). A clerk keeps the election records, including adding vote totals to the tally sheet. 950 C.M.R. §52.01(4). An inspector is assigned duties by a warden; two must be stationed at the entrance of a polling location and two at its exit. 950 C.M.R. §52.10(5).

After November 14, 2019, the Plaintiff was not a warden, clerk, inspector, or deputy. But the incumbent of statutory office exemption encompasses not only offices established "by" the relevant law, but also offices established "under the authority of" the relevant law. *See* Mass. Gen. Laws ch. 149, § 33B. Yet the exemption encompasses only those offices "specifically" established under the authority of the relevant law, *see id*., and the court "must strive to give effect to each word of a statute so that no part will be inoperative or superfluous." *Ciani v. MacGrath*, 481 Mass. 174, 179 (2019). The City does not explain how a statute addressing temporary positions that require the execution of duties at one polling place on election days "specifically" establishes positions that are permanent and require the execution of duties at all polling places and on other days. Nor has the City drawn the court's attention to evidence that when recognizing the Election Consultant position and later creating the Election Coordinator position, municipal officials understood the positions to be established "under the authority of" Mass. Gen. Laws ch. 54, § 11.

3. <u>Additional service</u>.

Relying on the SJC's decision in *Amelotte v. City of Worcester,* 343 Mass. 155 (1961), the City argues that the Plaintiff agreed to work 11 hours on Wednesdays and Mass. Gen. Laws ch. 149, § 33B, only applies when an employer requires "additional service" within the meaning of the statute. (#75 at 15.) *Amelotte* is factually distinguishable from this case. Mr. Amelotte was appointed as a nurse anesthetist working at the municipal hospital and that was his only job until, at his request, he was appointed as a nurse supervisor in the police department. He worked as a nurse anesthetist at the hospital from 7 AM to 3 PM and then as a nurse supervisor at the police department from 4 PM until midnight. *Amelotte*, 343 Mass. at 156. The SJC held that he did not meet the requirements of Mass. Gen. Laws ch. 149, § 33B:

> We do not think that it was the intent of the Legislature by such language to provide overtime compensation where, as here, an employee has performed services for a city in two distinct job classifications, in neither of which he performed or was authorized to perform services for more than eight hours per day. The plaintiff simply succeeded in getting two jobs from the city.

*Amelotte*, 343 Mass. at 159.

Mr. Amelotte had two city jobs and did not work in excess of 8 hours a day at either one of them. Ms. Gale had one city job. And as set out in detail above, she reported working in excess of 8 hours some days (and in excess of 40 hours some weeks).

While factually distinguishable, *Amelotte* stands for the general legal proposition that "additional service" in Mass. Gen. Laws ch. 149, § 33B, means "authorized by a 'person whose duty it is to employ, direct or control' the employee," and a lack of evidence that the additional service was authorized by a person whose duty it is to employ, direct or control, the employee is fatal to a claim for overtime pay. *Amelotte*, 343 Mass. at 159 (quoting Mass Gen. Laws ch. 149, § 33B); *see Doten v. City of Brockton*, 328 Mass. 563, 566 (1952) (rejecting claim for overtime pay under Mass. Gen. Laws. ch. 149, § 33A; "In order to recover it was not enough for the plaintiffs

to show that they performed additional service. They were required to go farther and prove that such service was authorized in accordance with the provisions of § 33A"); *accord Callahan v. Town of Athol*, 345 Mass. 572, 574-75 (1963) (relying on *Doten* and *Amelotte* in rejecting claim for additional day's pay under Mass. Gen. Laws ch. 147, § 17A: "The additional day's pay is clearly contingent upon the unavailability of an 'additional day off' due to 'personnel shortage or other cause.' The plaintiff has made no attempt to show that he was unable to secure an 'additional day off.' Indeed, he was in control of his own work schedule and could have taken a day off…").

The Plaintiff has not responded the City's "additional service" argument, *see* #83 at 5-7, and thus has not drawn the court's attention to evidence that her hours in excess of 8 hours on days other than Wednesdays (or for that matter, in excess of 40 hours a week) were "authorized in accordance with the provisions of" Mass. Gen. Laws ch. 149, § 33B. *See Doten*, 328 Mass. at 566. The court recognizes that the Plaintiff submitted time sheets reporting that she worked in excess of 8 hours on days other than Wednesdays (and in excess of 40 hours some weeks) and that Hurtubise signed them, *see*, *e.g.*, #66-18 at 9, but the Plaintiff does not explain how this sequence meets the requirements of § 33B.

Moreover, the Plaintiff alleges that Hurtubise told her not to request overtime pay and refused to approve her overtime hours because he was "over budget and [he] did not want [the Plaintiff's] earnings to exceed" the Assistant City Clerk's. Gale Aff. ¶¶ 10, 57-58. That is the opposite of "authoriz[ation]" of "additional service." The court grants summary judgment to the City on so much Count VI that is a claim for overtime wages for hours worked in excess of 8 hours on days other than Wednesdays and in excess of 40 hours a week.

On the other hand, the City advertised the Election Coordinator position as involving 11 hours of work on Wednesdays. (#78-3 at 2.) A finding that the hours worked in excess of 8 hours

on Wednesdays were not "authorized in accordance with the provisions of" Mass. Gen. Laws ch. 149, § 33B, would not comport with the standard on its motion.

D. The Failure to Pay Overtime Wages for Hours Worked in Excess of 35 Hours a Week under the Employee Handbook (Count VI).[30]

Under Massachusetts law, the terms of an employee handbook can form part of an implied contract. *Warren v. The Children's Hosp. Corp.*, #23-1158, 2026 WL 2645510, at *3 (1st Cir. Sept. 8, 2026) (per curiam) (citing, *inter alia*, *O'Brien v. New Eng. Tel. & Tel. Co.*, 422 Mass. 686, 691 (1996)). The question is whether the Plaintiff "could reasonably have believed" that the employee handbook "constituted the terms or conditions of employment, equally binding" on her and the City. *See id*. In answering that question, the court considers whether the City retained the right to unilaterally modify the terms; whether the terms were negotiated; whether the handbook stated that it provided only guidance regarding the City's policies; whether it specified a term of employment; and whether the Plaintiff signed the handbook to manifest assent to its terms. *See id*.; *see generally Jackson v. Action for Bos. Cmty. Dev., Inc.*, 403 Mass. 8 (1988).

The words in the employee handbook are important but "the context of [its] preparation and distribution" "is the most persuasive proof as to whether the employee's reliance thereon as a binding and legally enforceable commitment is reasonable." *Warren*, 2026 WL 2645510, at *3 (quoting *LeMaitre v. Mass. Tpk. Auth*., 452 Mass. 753, 755-56 (2008) (*LeMaitre II*)). The wording of a disclaimer or the absence of one is relevant, but not dispositive. *See Warren*, 2026 WL 2645510, at *4; *see also LeMaitre II*, 452 Mass. at 756. Furthermore, "the SJC has indicated that a provision in an employee handbook about compensation is more likely to be an implied term of the employer-employee contract than a provision that can be read to modify the employee's at

[30] Count VII is also a Mass. Gen. Laws. ch. 149, § 148, claim based on the failure to pay overtime wages under the employee handbook. *See* #62 ¶¶ 72-75.

will-status (e.g., a measure of job security or a disciplinary procedure before discharge)." *Warren*, 2026 WL 2645510, at *3 (citing *LeMaitre*, *II*, 452 Mass. at 754).

The First Circuit earlier this month in *Warren* reversed the grant of summary judgment for a defendant, rejecting an argument that a royalty section in an employer's policy did not form part of an implied contract.[31] The First Circuit did so notwithstanding that several of the relevant factors weighed in the employer's favor. The employer retained the right to unilaterally modify the policy and its terms were not negotiated. Moreover, the employee was at-will. *See Warren*, 2026 WL 2645510, at *4 (citing *O'Brien*, 422 Mass. at 692) ("Negotiation of the terms of a company-wide manual for nonunion employees is not likely and is not an essential precondition of the enforceability of the employer's obligations stated in the manual"); also citing *LeMaitre v. Mass. Tpk. Auth.*, 70 Mass. App. Ct. 634, 640 (2007) ("The mere fact that management can make unilateral changes to a personnel manual would not, standing alone, lead an employee to conclude that rights already obtained would be altered or taken away by such changes"), *aff'd*, 452 Mass. 753 (2008)). Here, the City retained the right to unilaterally modify the employee handbook, *see* #78-15 at 5, and there is no evidence that its terms were negotiated or that the Plaintiff was not an at-will employee.

[31] Dr. Warren was employed by Immune Disease Institute ("IDI") when he invented a method for reprogramming skin cells into stem cells using synthetic mRNA. At the time, IDI had a royalty-sharing policy. After Dr. Warren's invention but before its licensing, in anticipation of a merger, IDI and the defendant, The Children's Hospital, executed an agreement that The Children's Hospital's royalty-sharing policy would govern instead of IDI's. The Children's Hospital's royalty-sharing policy was less favorable to Dr. Warren than IDI's, and Dr. Warren argued that IDI's formed part of an implied contract that IDI could not retroactively modify. *See Warren*, 2026 2645510, at *2-3. The district court assumed that IDI's royalty-sharing policy formed part of an implied contract and ruled that IDI exercised its unilateral right to amend and granted summary judgment for The Children's Hospital. On appeal, the First Circuit rejected The Children's Hospital's request to affirm on the alternative basis that IDI's royalty-sharing policy did not form part of an implied contract. *Id*. at *3. It went on to find a genuine dispute as to whether IDI could retroactively modify. *Id*. at *5.

The overtime section in the employee handbook was about compensation like the royalty-sharing policy in *Warren*, and such a provision is more likely to be an implied term of the employer-employee contract. The court acknowledges, however, that the disclaimer highlighted by the City differs significantly from language in the *Warren* policy. The policy in *Warren* stated that it "shall govern the actions, rights and responsibilities of IDI and Covered Persons regarding all Invention, and Technology, from and after the Effective Date…," *see Warren*, 2026 WL 2645510, at *4, where the employee handbook stated: "This Handbook and its contents do not constitute an employment contract and are provided for informational purposes only," *see* #78-15 at 5. However, in *Ferguson v. Host Intern., Inc.*, 53 Mass. App. Ct. 96 (2001), on which the City relies, *see* #75 at 16, the Massachusetts Appeals Court reversed the grant of summary judgment for the employer and the disclaimer language there was like that here. *Id.* at 99 n. 4, 102-103, 105 ("contents…are presented as a matter of information only and are not intended to create, nor are they to be construed to constitute, a contract, express or implied…").

The overtime section stated that the City "also pays time and a half for overtime to non-exempt employees whose normal workweek is 35 hours" and that employees "should consult collective bargaining agreements for any additional provisions." (#78-15 at 4.) The section did not describe circumstances in which the City would not pay overtime "to non-exempt employees whose normal workweek is 35 hours" and the phrase "also pays" is not as indicative of employer discretion as, for instance, "could also pay." But the overtime section is not as unambiguous as the Plaintiff suggests, either. The phrase "also pays" is not as indicative of employer non-discretion as, for instance, "shall also pay."

No "only guidance" language was included in the overtime section itself, and the "only guidance" language included in the notice and preamble is not as unambiguous as the City

suggests. The notice also stated:

> References to state and Federal laws are merely summaries and some provisions of the information as they affect conditions of employment are subject to change as interpretated by the courts. In addition, specific cases may require a different approach. Applicable collective bargaining agreements supersede provisions of this Handbook.

*Id*. at 5. The notice did not refer to any particular section of the handbook and could be understood to mean simply that employees should consult case law and applicable collective bargaining agreements.

The "only guidance" sentence in the preamble is preceded by this one: "It is hoped that this publication will be a useful reference regarding the rights, privileges, and responsibilities of a career in City service," *see id*. at 3, suggesting that the handbook created "rights." The "only guidance" sentence in the preamble is followed by this one: "Many union contracts may supersede portions of this Handbook," *see id.*, which, again, could be understood to mean simply that employees should consult applicable collective bargaining agreements. *Compare Warren*, 2026 WL 2645510, at *4 (rejecting the defendant's reliance on "only guidance" language which, in context, appeared to refer to so much of the policy that governed consulting agreements and conflicts of interest with third parties, not royalties; furthermore, other language in the policy indicated that the policy was meant to provide "fair and equitable allocation of responsibilities and rewards").

There are gaps in the record on "the context of [the employee handbook's] preparation and distribution." *See Warren*, 2026 WL 2645510, at *3 (citation to *LeMaitre II* omitted). The City has submitted the overtime section separately from the acknowledgment, *compare* #78-15 at 3-5 *with* #78-10 at 2, which itself did not refer to any particular section of the handbook and is on page 32 although the notice as submitted with the overtime section is on page 31. *Compare* #78-15 at 3-5

*with* #78-10 at 2. It is not clear what the Plaintiff acknowledged receiving, and on the City's cross-motion, the court cannot infer unfavorably to the Plaintiff that she acknowledged receiving the preamble and notice. On the Plaintiff's motion, the court cannot infer unfavorably to the City that she acknowledged receiving the overtime section. *Cf. Warren*, 2026 WL 2645510, at *5 (rejecting the defendant's argument that there was insufficient evidence that the employer's royalty-sharing policy was attached to the signed acknowledgment; "…the two documents were continuously paginated, and [the defendant's] employee testified that 'all new employees went through a process where they were given the policy and…were required to sign it'").

The Plaintiff attests that she first received the handbook in 2013 or 2014, *see* Gale Supp. Aff. ¶ 5, and there is evidence that the 2019 version was "a rewrite of something that was done earlier," *see* Crowley Depo. Tr. at 37 (#78-9 at 6), although no other version of the handbook has been made part of the summary judgment record. The court emphasizes that it is not necessary that the employee sign the handbook for its terms to form part of an implied contract. *See*, *e.g.*, *O'Brien*, 422 Mass. at 693 (the plaintiff received a copy of the manual annually but did not sign it).

Contrary to the Plaintiff's claim, *see* #81 at 2; #83 at 4, it is not undisputed that the City "implemented" the overtime section. The court has already discussed the evidence that contradicts Nazarian's claim that effective October 14, 2020, the City paid the Plaintiff a salary and the special, additional compensation during the busy season. There is also evidence that supports her claim. Per the payroll register, between October 14, 2020 and November 25, 2020, i.e. in the busy season, the Plaintiff was paid $27/hour for some hours. Between December 2, 2020, and July 28, 2021, i.e. in the off season, she was not paid $27/hour for any hours. And between August 4, 2021, and October 31, 2021, i.e. in the busy season, she was paid $27/hour for some hours. From this pattern,

a reasonable jury could find that the City was paying the Plaintiff as Nazarian claims, not implementing the overtime section.

In sum, neither party is entitled to summary judgment on the question of whether the overtime section formed part of an implied contract. The court adds here that the Plaintiff does not dispute that the reference to “non-exempt” in the second sentence of that section is a reference to her FLSA exempt status, *see* #81 at 3, meaning that the question of whether the overtime section was breached is tied to the exempt status question. As discussed below, neither party is entitled to summary judgment on the exempt status question.

E. The FLSA Claims.

The court at last reaches the Plaintiff’s FLSA claims. It starts with some statutory background. Because it is not clear what wages the Plaintiff is pursuing through Count II and depending on the wages she is pursuing, Count II may fail as a matter of law for reasons independent of her exempt status, the court addresses Count II first. It then turns to Count I.

1. Background.

The FLSA “was designed to protect employees from excessive hours and substandard wages, ‘which endangers national health and efficiency and as a result the free movement of goods in interstate commerce.’” *Doctors Hosp., Inc. v. Silva Recio*, 558 F.2d 619, 623 (1st Cir. 1977) (quoting *Brooklyn Savings Bank v. O’Neil*, 324 U.S. 697, 706-07 (1945)). The statute imposes minimum wages and maximum hours. *See* 29 U.S.C. §§ 206(a)(1)(C), 207(a)(1).

Relevant here, the FLSA provides that certain employees must not employ any employee “for a workweek longer than forty hours unless such employee receives compensation for his employment in excess of the hours above specified at a rate of not less than one and one-half times the regular rate at which he is employed.” 29 U.S.C. § 207(a)(1). The elements of an FLSA claim

are that (1) the plaintiff was employed by the defendant; (2) the work involved interstate activity; and (3) the plaintiff performed work for which she was not properly compensated. *Manning v. Boston Med. Ctr. Corp.*, 725 F.3d 34, 43 (1st Cir. 2013). To succeed on a claim for unpaid overtime wages under the FLSA, a plaintiff must show that she was employed "for a workweek longer than forty hours" and that hours worked in excess of the 40 hours were not paid at the "one and one-half times" regular rate. *Id*.

There are exemptions to the FLSA overtime requirements. Relevant here, the requirements do not apply "with respect to…any employee employed in a bona fide executive [or] administrative…capacity…(as such terms are defined and delimited from time to time by regulations of the Secretary…)." 29 U.S.C. § 213(a)(1). An employer relying on the "administrative exemption" must show that: (1) the employee is "compensated on a salary…basis…at a rate of not less than $684 per week…, exclusive of board, lodging or other facilities";[32] (2) the employee's "primary duty is the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers"; and (3) the employee's "primary duty includes the exercise of discretion and independent judgment with respect to matters of significance." 29 C.F.R. §541.200(a); *see Marcus v. Am. Contract Bridge League*, 80 F.4th 33, 38 (1st Cir. 2023).

An employer relying on the "executive exemption" must show that: (1) the employee is "compensated on a salary basis…at a rate of not less than $684 per week…, exclusive of board,

[32] As of 2004, for both the administrative and executive exemptions, the relevant salary threshold was $455 a week. *Texas v. U.S. Dept. of Labor*, 738 F. Supp. 3d 807, 814 (E.D. Tex. 2024). In 2016, the Department of Labor attempted to increase the relevant salary threshold to $913 a week, but the 2016 rule was invalidated. *Id*. In 2019, the Department of Labor increased the relevant salary threshold to the current threshold, $684 a week. *Id* at 815. The 2019 rule became effective January 1, 2020.

lodging or other facilities";[33] (2) the employee's "primary duty is management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof"; (3) the employee "customarily and regularly directs the work of two or more other employees"; and (4) the employee "has the authority to hire or fire other employees or whose suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees are given particular weight." 29 C.F.R. §541.100(a); *see Marzuq v. Cadete Enterprises, Inc.*, 807 F.3d 431, 435 (1st Cir. 2015).

The employer bears the burden to establish each of the three prongs of the administrative exemption and each of the four prongs of the executive exemption. *See Walsh v. Unitil Serv. Corp.*, 64 F.4th 1, 5 (1st Cir. 2023); *see also Marzuq*, 807 F.3d at 435.

"Salary basis" is defined in 29 C.F.R. §541.602(a). *See* 29 C.F.R. §§541.200(b), 541.100(b). "An employee will be considered to be paid on a 'salary basis'…if the employee regularly receives each pay period on a weekly, or less frequent basis, a predetermined amount constituting all or part of the employee's compensation, which amount is not subject to reduction because of variations in the quality or quantity of the work performed." 29 C.F.R. §541.602(a).

"Primary duty" means "the principal, main, major, or most important duty that the employee performs." 29 C.F.R. §541.700(a). Factors relevant to the "primary duty" determination "include, but are not limited to, the relative importance of the exempt duties as compared with other types of duties; the amount of time spent performing exempt work; and the employee's relative freedom from direct supervision." *Marcus*, 80 F.4th at 38 (cleaned up) (quoting 29 C.F.R. § 541.700(a)). "However, 'an employee's "primary" duty is not determined solely by the amount of time [they] devote[] to the different categories of tasks -- i.e., exempt vs. nonexempt -- but on

[33] *See* footnote 32, *supra*.

the overall character of [their] position.'" *Id*. (quoting *Marzuq*, 807 F.3d at 436); *see also* 29 C.F.R. §541.700(a) ("Determination of an employee's primary duty must be based on all the facts in a particular case, with the major emphasis on the character of the employee's job as a whole"); 29 C.F.R. §541.700(b) ("employees who spend more than 50 percent of their time performing exempt work will generally satisfy the primary duty requirement. Time alone, however, is not the sole test, and nothing in this section requires exempt employees spend more than 50 percent of their time performing exempt work"). "How an employee spends his or her time at work is a question of fact, but whether the particular activities subject the employee to an exemption from the FLSA overtime requirements is a question of law." *Crowe v. Examworks, Inc.*, 136 F. Supp. 3d 16, 27 (D. Mass. 2015).

"Because of the remedial nature of" the FLSA, its exemptions "should be 'narrowly construed' and 'limited to those establishments plainly and unmistakably within their terms and spirit.'" *Hines v. State Room, Inc.*, 665 F.3d 235, 242 (1st Cir. 2011) (quoting *Arnold v. Ben Kanowsky, Inc.*, 361 U.S. 388, 392 (1960)).

2. <u>Count II: "Off-the-Clock Work."</u>

The Plaintiff says little about Count II in her opening memorandum, *see* #65 and 15-16, and in her reply and opposition to the City's cross-motion, she says nothing, *see* ##81, 83. Meanwhile, the City argues, *see* #75 at 12 & n.7; #85 at 4, that if Count II is a "pure gap time" claim, meaning that the Plaintiff is pursuing straight-time wages for her "off-the-clock work" in a week in which she worked 40 hours or less, such claims are not cognizable under the FLSA, which only requires payment of minimum and overtime wages. *See Davis v. Abington Mem. Hosp.*, 765 F.3d 236, 243-44 (3d Cir. 2014) (joining the "clear weight of authority" in holding that pure gap time claims are not cognizable under the FLSA) (and cases cited); *accord Preston v. World Travel*

*Holdings, Inc.*, #23-cv-12389-JEK, 2024 WL 519548, at *3 (D. Mass. Feb. 9, 2024) (state common law claims for breach of contract and unjust enrichment based on pure gap time "off-the-clock work" are not preempted by the FLSA).

The Plaintiff does not claim any minimum wage violation, and there is insufficient evidence of one. The federal minimum wage is $7.25/hour. 29 U.S.C. § 206(a)(1)(C). From November 14, 2019, to October 14, 2020, the Plaintiff was paid $18/hour, more than double the federal minimum wage. From October 14, 2020, to November 1, 2021, with two exceptions, she was paid at least $630. Assuming she worked 40 hours in the weeks in which she was paid only $630, she still made more than double the federal minimum wage.[34] From November 1, 2021 until her termination, she was paid $1,222. Assuming she worked 40 hours in these weeks, she made about quadruple the federal minimum wage.

There is a circuit split as to whether "overtime gap time" claims are cognizable under the FLSA. These are claims by an employee who did work overtime hours in a week but who was not paid for all straight-time hours, for example, an employee who worked 43 hours in a week and whose employer paid her for 38 straight-time hours and the 3 overtime hours, and she pursues the remaining 2 straight-time hours. *Sec'y U.S. Dep't of Labor v. Comprehensive Healthcare Mgmt. Srvcs.*, 177 F.4th 427, 434 (3d Cir. 2026). After briefing here was complete, the Third Circuit joined the Second Circuit in holding that overtime gap time claims are not cognizable under the FLSA. *Id.*; *see Lundy v. Cath. Health Sys. of Long Island, Inc.*, 711 F.3d 106, 115-17 (2d Cir.

[34] There was also no minimum wage violation in connection with the March 31, 2021, paycheck. $558 divided by 40 hours is $13.95/hour. As for the December 23, 2020, paycheck, there are no time sheets in the summary judgment record for November and December 2020, and from the court's review of the Plaintiff's personal calendars, no notations at the end of November 2020 or in December 2020 suggest that she worked 40 hours in that span. *See* #66-18 at 11-12.

2013). The Fourth Circuit has held that such claims are cognizable. *Conner v. Cleveland Cty.*, 22 F.4th 412, 426 (4th Cir. 2022).

Given the lack of attention that the Plaintiff has paid this claim, the court need only say this: If Count II is a pure gap time claim, under the "clear weight of authority," it fails as a matter of law. If Count II is an overtime gap time claim, the Plaintiff has waived an argument that the court should follow the Fourth Circuit, not the Second and Third Circuits. *See Higgins v. New Balance Athletic Shoe, Inc.*, 194 F.3d 252, 260 (1st Cir. 1993) ("A party who aspires to oppose a summary judgment motion must spell out [her] arguments squarely and distinctly, or else forever hold [her] peace…. The district court is free to disregard arguments that are not adequately developed….") (citations omitted). If the Plaintiff is merely pursuing more overtime wages for her "off-the-clock work," *see* #65 at 16, she can do so through Count I. Summary judgment will enter for the City on Count II.

3. <u>Count I: "Misclassification</u>."

a. <u>Election Consultant</u>.

i. <u>November 14, 2019, to October 14, 2020</u>.

The court adopts a broader reading of Count I than the City does. The City argues that Count I is a claim for overtime wages after November 1, 2021, when the Plaintiff was the "exempt" Election Coordinator. This is because, between October 14, 2020, and November 1, 2021, when the Plaintiff was the "non-exempt" Election Consultant, she could not have been "misclassified." *See* #75 at 5; *see also* #85 at 2. Although captioned as a "Misclassification" count, fairly read, Count I is a claim for overtimes wages after November 14, 2019. *See*, *e.g.*, #62 ¶ 15 ("At all times relevant hereto…").

As discussed above, it appears that in 7 weeks between November 14, 2019, and October

14, 2020, the Plaintiff worked in excess of 40 hours and was paid $18 an hour for all hours worked. *See* #66-3 at 5-7.[35] The City would presumably argue that claims based on these paychecks are barred by the FLSA's two-year statute of limitations, as they were issued before November 14, 2020. *See* #76 ¶¶ 9-10. The Plaintiff, according to the City, "offers no evidence -- and cannot offer any -- that [it] acted willfully," such that the FLSA's three-year statute of limitations would apply. *See* #75 at 5 n.1, 11 n. 6, 18-20.

A violation of the FLSA was willful if "the employer either knew or showed reckless

---

[35] The basis for the City's assertion that between November 14, 2019, and October 14, 2020, the Plaintiff did not work in excess of 40 hours in a week is unclear. *See* #75 at 19. Contrary to the City's suggestion, moreover, even if the Plaintiff's deposition testimony could be read as an "admi[ssion]" that "she was paid for every hour she reported," *see id*., she testified that she was not paid at the correct rate of pay. Gale Depo. Tr. at 25 (#78-2 at 5).

Anyway, the court rejects the City's reading of the Plaintiff's deposition testimony as an "admi[ssion]" that she was "paid for every hour she reported." The City cites this exchange, *see* #76 ¶ 70, pertaining to the lunch break issue:

> Q. And just so we're clear, if you worked through a meal break, so, you didn't take time off you worked through the meal break, you were compensated at your straight time rate of pay, you were paid for that straight time?
>
> A. Straight time.
>
> Q. You were paid for that time, correct?
>
> …
> A. I don't know.
>
> Q. So, if you didn't write down that you took a break, time wasn't automatically taken off of the hours you recorded?
> …
> A. I think it was, but I'm not sure.

Gale Depo. Tr. at 138 (#78-2 at 38). The other exchanges the City cites, *see* #78 ¶ 69, also do not support this reading. *See id*. at 25 (#78-2 at 5) (counsel admits that the question was confusing); *id*. at 140 (#78-2 at 39) (counsel used the phrase "you get paid" for the number of hours reported, not "you were paid"); *id*. at 167 (#78-2 at 45) (the Plaintiff's answer to the first question was "I guess. I'm not sure" and counsel's next question allowed for "perhaps a disconnect on occasion").

disregard for the matter of whether its conduct was prohibited by" the FLSA. *McLaughlin v. Richland Shoe Co*., 486 U.S. 128, 133 (1988). This is not a negligence standard. *See id.*; *see also Baystate Alt. Staffing, Inc. v. Herman*, 163 F.3d 668, 681 (1st Cir. 1998).

Whether a violation was willful is a mixed question of law and fact. *Newspapers of New England, Inc*., 44 F.3d at 1080. In determining whether an employer's behavior evinces knowledge or reckless disregard of alleged FLSA violations, courts typically consider such relevant factors as whether the employer failed to keep adequate payroll records, intentionally manipulated its records, or paid employees "off the books." *Pineda v. Skinner Srvcs., Inc.*, #16-cv-12217-FDS, 2020 WL 5775160, at *12 (D. Mass. Sept. 28, 2020) (citing, *inter alia*, *Chao v. Hotel Oasis, Inc.*, 493 F.3d 26, 35 (1st Cir. 2007)); *see also Lopez v. Corporacion Azucarera de Puerto Rico*, 938 F.2d 1510, 1515-16 (1st Cir. 1991) ("We might have had little difficulty concluding that a genuine issue of material fact was raised as to the willfulness issue if the [employee] had attested to the truth of counsel's statement…that [the employer] 'forbade them from filling in the hours worked in their time cards, in order to exempt them from the benefits of the [FLSA]'"). Courts also consider a lack of diligence in researching FLSA requirements and ignoring employee complaints about violations. *Pineda*, 2020 WL 5775160, at *12 (citing, *inter alia*, *Cheng v. IDEAssociates, Inc.* #96-cv-11718-PBS, 2000 WL 1029219, at *8 (D. Mass. July 6, 2000)). "When a party presents 'some evidence that, particularly when viewed in the light most favorable to them and resolving all doubts and reasonable inferences in their favor…at least supports an inference [of] willfulness…it should be left to the trier of fact to make that determination.'" *Eppich v. FedEx Ground Pkg. Sys. Inc.*, #25-cv-00522-SDN, 2026 WL 1353765, at *3 (D.Me. May 15, 2016) (quoting *Walsh v. N. Providence Primary Care Assocs., Inc.*, 537 F. Supp. 3d 195, 202 (D.R.I. 2021)).

The summary judgment record supports an inference of willfulness, but that is all. To begin, even assuming that the City admitted that it has not conducted a FLSA audit,[36] a failure to investigate, without more, does not constitute willfulness. *See McGrath*, 419 F. Supp. 3d at 259.

But there is "more" here. The Plaintiff attests that Hurtubise told her not to request overtime pay. Gale Aff. ¶ 10 (from November 14, 2019, until the pay period covered by her paycheck dated October 14, 2020). And she attests that he refused to approve her overtime hours, stating that he was "over budget and [he] did not want [the Plaintiff's] earnings to exceed" the Assistant City Clerk's. *Id*. ¶ 58 (including after April 2021). The City argues that her accusations are vague, *see* 75 at 19, and to be sure the Plaintiff does not specify the exact dates on which Hurtubise made these comments. Nazarian's denial of knowledge and documentary record of such refusals, *see* #77 ¶ 7, is vague. A reasonable jury could find that Hurtubise made these comments and from them, that he knew that the Plaintiff was entitled to overtime wages but refused to pay them.

In addition, as the Plaintiff argues, *see*, *e.g.*, #83 at 18, there are irregularities in the codes used in the payroll register. In this period, for instance, the entries for the March 4, 11 and 18, 2020, paychecks do not include the code "Regular" but do include the code "Overtime" despite that the Plaintiff was paid straight-time wages for all hours, including the hours in excess of 40 hours those weeks. (#66-3 at 5); *contrast*, *e.g.*, *id*. at 4 ("Regular" code for 25 hours covered by the February 5, 2020, paycheck, at straight-time rate). There is no evidence in the summary judgment record explaining these irregularities and a reasonable jury could conclude that use of

[36] The plaintiff in *Conboy* requested "[a]ny FLSA audits of [the City] conducted between January 1, 2000 to present," and the City responded that it was "aware of no responsive documents." (#66-22 at 4.) In her initial statement of facts, Ms. Gale characterized the City's response as an admission that the City had not conducted FLSA audits in that period, a characterization that the City did not initially dispute, *see* #76 ¶ 67, but which the City disputed when Ms. Gale repeated it in her additional statement of facts, *see* #86 ¶ 87.

the code "Overtime" and not the code "Regular" when the Plaintiff was paid straight-time wages was manipulative.

The City argues that the other wage practice suits are too dissimilar to this wage practice suit to prove willfulness and regardless, the other suits settled. (#85 at 7 & n.5.) But, at the summary judgment stage, the court considers whether the other wage practice suits support an inference of willfulness, not whether they prove it. *Contrast Ojeda-Sanchez v. Bland Farms, LLC*, 499 Fed. Appx. 897, 899, 903 & n. 11 (11th Cir. 2012) (cited by the City, *see* #85 at 7; affirming a finding of willfulness after bench trial) *with Chao v. A-One Med. Srvcs., Inc.*, 346 F.3d 908, 911, 919 (9th Cir. 2003) (on review of a summary judgment order: "Unlike the district court, we find probative A-One's former FLSA violations, even if they were different in kind from the instant one and not found to be willful. The fact that A-One previously had run-ins with the Labor Department certainly put A-One and Black on notice of other potential FLSA requirements"). At any rate, Hurtubise's comments and the coding irregularities are sufficient to support an inference of willfulness.

In sum, although there does not seem to be any genuine dispute that the Plaintiff was not properly compensated in this period and was non-exempt,[37] summary judgment will not enter for the Plaintiff. A jury must determine willfulness and thus the applicable statute of limitations.

ii. <u>October 14, 2020, to November 1, 2021</u>.

As to this period, the Plaintiff has not met her burden of showing a lack of a genuine dispute whether she was employed "for a workweek longer than forty hours" and that hours worked in excess of the 40 hours in a week were not paid at the "one and one-half times" regular rate. *See*

---

[37] The City does not argue that the administrative and executive exemptions applied before November 1, 2021. *See* #75 at 5-11.

*Manning*, 725 F.3d at 43.

All paychecks dated between October 14, 2020, and November 25, 2020, include payments at $27/hour. (#66-3 at 7-8.)

Nine of the 13 paychecks dated between August 4, 2021, and October 31, 2021, include payments at $27/hour or higher. *Id*. at 14-16. The record is insufficient regarding the other 4 paychecks in this period (August 11, 18, September 25, October 6, 2021). *Id*. The Plaintiff has not submitted time sheets from this period and fails to adequately explain her personal calendars.

None of the paychecks dated between December 2, 2020, to July 28, 2021, include payments at $27/hour, *see id*. at 8-14, but the Plaintiff has not shown that in any of the pay periods covered by these paychecks, she was employed "for a workweek longer than forty hours," nor can one draw a reasonable inference of that from this record. The Plaintiff has not submitted time sheets from this period and fails to adequately explain her personal calendars.[38] That the December 2, 2020, and March 31, 2021, paychecks show payments of less than $630 suggest that the Plaintiff did not even work 35 hours during the relevant weeks. *See id*. at 9, 11. That the May 12, 2021, paycheck shows payment for 4 more hours, *see id*. at 12, does not suggest that the Plaintiff worked in excess of 40 hours during the relevant week (35 plus 4 equals 39).

b. <u>Election Coordinator</u>.

[38] Assuming that it is reasonable to draw an inference as to weekly hours between December 2, 2020, and July 28, 2021, from the evidence of weekly hours between December 2, 2019, and July 28, 2020, the court notes that the time sheets covering December 11, 2019, through August 1, 2020, show that, with one exception, the Plaintiff worked far fewer or just slightly over 40 hours a week. *See* #66-18 at 3 (December 11, 2019: 5 hours); *id*. at 4 (January 18, 2020: 12 hours); *id*. at 5 (January 24, 2020: 25 hours); *id*. at 6 (January 31, 2020: 20.5 hours); *id*. at 7 (February 6, 2020: 17.5 hours); *id*. at 8 (February 14, 2020: 20.5 hours); *id*. at 9 (February 22, 2020: 43 hours); *id*. at 13 (March 6, 2020: 44 hours); *id*. at 14 (March 11, 2020: 19 hours); *id*. at 15 (March 20, 2020: 16 hours); *id*. at 16 (March 27, 2020: 16 hours); *id*. at 18 (July 18, 2020: 25 hours; July 25, 2020: 12 hours; August 1, 2020: 33 hours); *but see id*. at 12 (February 28, 2020: 60 hours).

That leaves the Plaintiff's claim that after November 1, 2021, as the Election Coordinator, she was misclassified as exempt. This claim does not implicate the statute of limitations issue. Nor does the City seek summary judgment on the ground that the Plaintiff has not shown that after November 1, 2021, she worked in excess of 40 hours in a week. *See* #75 at 5-11.

Conversely, the Plaintiff does not seek summary judgment on the inapplicability of the administrative and executive exemptions because the City has not shown that as the Election Coordinator, she was compensated on a "salary basis" and above the weekly threshold. She focuses on the second and third prongs of the administrative exemption, *see* #65 at 11-13, and on the second, third, and fourth prongs of the executive exemption, *see id*. at 10-11.

The court agrees with the City, *see* #75 at 9 & n. 5; #85 at 4, that a reasonable jury could find that the Plaintiff truthfully claimed previously that she effectively was an elections department head but is now falsely disclaiming responsibilities because she recognizes that effective department-head status hurts her present claims. But a reasonable jury could just as readily find that the Plaintiff exaggerated her responsibilities when she was seeking the department-head position and then before the DLR, when she presumably was seeking to prove that she was qualified for the position and would have been selected but for the retaliation. Anyway, the court will not make credibility determinations at the summary judgment stage. *See Velez-Gomez*, 8 F.3d at 877.

i. Executive exemption.

(a) Third prong.

The court need only address the third prong of the executive exemption -- whether the Plaintiff "customarily and regularly direct[ed] the work of two or more other employees," *see* 29 C.F.R. §541.100(a)(3) -- to deny the City's cross-motion on this exemption. There is no genuine

factual dispute that the Plaintiff trained and supervised poll workers. But the phrase "two or more other employees" means "two full-time employees or their equivalent. One full-time employee and two half-time employees, for example, are equivalent to two full-time employees. Four half-time employees are also equivalent." 29 C.F.R. §541.104(a). This regulation does not define "full-time," but the current version of the Department of Labor's Wage-Hour Division in its Field Operations Handbook states that "full-time" generally means 40 or more hours a week, and further states:

> …[T]he subordinates ordinarily must work 80 total hours per workweek to qualify as the equivalent of two full-time employees. For example, one full-time employee and two half-time employees are equivalent to two full-time employees, as are four half-time employees. If the subordinates include occasional, temporary, or part-time employees, the employee must supervise two or more subordinates for a combined total of 80 hours of work….

DOL Field Operations Handbook 22b02(b), available at https://www.dol.gov/sites/dolgov/files/WHD/legacy/files/FOH_Ch22.pdf (last visited September 30, 2026); *see Sec'y of Labor v. Daylight Dairy Prods., Inc.*, 779 F.2d 784, 787 (1st Cir. 1985) (finding 80-hour rule reasonable and applying it), *disapproved of on other grounds, Richland Shoe Co.*, 486 U.S. at 131 n.1; *see also Brown v. Wheatleigh Corp.*, #18-cv-30056-KAR, 2021 WL 4079779, at *4 (D. Mass. Sept. 8, 2021).

The Plaintiff argues that if the City employed 100 poll workers in a year and all 100 poll workers worked 16 hours a year, that is 1,600 hours a year, which is less than even one other full-time employee based on 40 hours a week, multiplied by 52 weeks, for a total of 2,080 hours a year. (#65 at 10.) But any number of part-time employees will be the equivalent of the required two other full-time employees if the total number of hours supervised exceeds 80 in a week. The reasonable inference is that the 100 poll workers were working on the same day -- election day. The Plaintiff satisfies the "two or more other employees" requirement if just 81 poll workers

worked one single hour on election day, as that would be 81 supervised hours in that week. *See Daylight Dairy*, 779 F.2d at 787 ("four persons each working 25 hours per week satisfy the requirement, because the hours supervised total 100"). The more reasonable inference is that the 100 poll workers worked 7 hours on election day, *see* #78-8 at 2 (flyer), meaning 700 supervised hours in that week.

It is the "customarily and regularly" requirement that poses the problem for the City. That phrase is defined to mean "a frequency that must be greater than occasional but which, of course, may be less than constant. Tasks or work performed 'customarily and regularly' includes work normally and recurrently performed every workweek; it does not include isolated or one-time tasks." 29 C.F.R. §541.701. And while "[c]courts have not required employers to show that the [employee] directed a total of eighty employee-hours of work each week for the entire relevant period of time …," *see Brown*, 2021 WL 4079779, at *5 (citation omitted), the First Circuit in *Daylight Dairy* "found 76% of the time to be too low to satisfy the 'customarily and regularly' requirement," and *Daylight Dairy* "is controlling law in this circuit," *see Brown*, 2021 WL 4079779, at *5-6; *see also Daylight Dairy*, 779 F.2d at 784. The Plaintiff directed the work of two full-time employees or their equivalent twice a year, on the election days. (#66 ¶ 35); *see* Gale Aff. ¶ 36. Whether calculated using the entire period that she was the Election Coordinator (roughly 52 weeks, so about 4%) or the busy election season (roughly 13 weeks, so about 15%), the City would not satisfy the "customarily and regularly" requirement as interpreted by *Daylight Dairy*. *Compare Brown*, 2021 WL 4079779, at *6 (assuming that the months of the year that the employer described as its off-season should be excluded from the calculation, the plaintiff directed the work of two full-time employees or their equivalent in just 13 of 20 pay periods, and 65% does not satisfy the "customarily and regularly" requirement under *Daylight Dairy*).

On the other hand, the Plaintiff is not entitled to summary judgment on the inapplicability of the executive exemption because she has not shown a lack of a genuine dispute on this third prong or the second and fourth prongs. There is a genuine dispute whether the Plaintiff supervised the Registrars of Voters Office staff. Nazarian attests that she did, *see* #77 ¶ 5,[39] an assertion supported by the Election Coordinator job posting, *see* #78-3 at 2. The job posting is relevant, but not dispositive. *See Brown*, 2021 WL 4079779, at *4 ("Whether an employee is exempt is determined by the employee's actual work activities, not by the employer's characterization of those activities through a job title or job description") (citation omitted).

That the Plaintiff disciplined one of the Registrars of Voters Office staff members once, purportedly at Hurtubise's behest, *see* Gale Depo. Tr. at 155-56 (#78-2 at 43-44), is sufficient evidence that she "customarily and regularly directed the work of two or more other employees" at this stage.

(b) Fourth prong.

[39] The Plaintiff's argument, *see* #83 at 9-10, that Nazarian lacks personal knowledge to attest to the Plaintiff's day-to-day work is unpersuasive. "Evidence can be excluded for lack of personal knowledge 'only if in the proper exercise of the trial court's discretion it finds that the witness could not have actually perceived or observed that which [s]he testified to.'" *Thicc Boy Prods., Inc. v. Swindelles*, #22-cv-00090-MSM, 2023 WL 3646040, at *2 (D.R.I. Feb. 15, 2023) (under Fed. R. Civ. P. 56(c)(4); quoting *United States v. Neal*, 36 F.3d 1190, 1206 (1st Cir. 1994) (under Fed. R. Evid. 602)). "Personal knowledge can include 'inferences and opinions, so long as they are grounded in personal observation and experience.'" *Id*. (quoting *Neal*, 36 F.3d at 1206). Nazarian was appointed as Acting Chief of Staff in September 2021, *see* #77 ¶ 2, and was included the next month in discussions with the Mayor and the City's former Human Resources Director about the Plaintiff's appointment to the Election Coordinator position. *See* #78-14 at 3 (responding to the Mayor's concerns regarding complaints she had received about the Plaintiff by recommending a 6-month probationary period). The Plaintiff communicated her concerns about a violation of Massachusetts election law to the Mayor and Nazarian, *see* #78-4 at 2, and as discussed above, the Plaintiff and Nazarian communicated about the election budget. Nazarian was on the first interview panel for the Election Manager position. Nazarian DLR Tr. at 113 (#66-2 at 49.)

As to the fourth prong -- whether the Plaintiff had "the authority to hire or fire other employees or [whether her] suggestions and recommendations as to the hiring, firing, advancement, promotion or any other change of status of other employees [were] given particular weight," *see* 29 C.F.R. §541.100(a)(4), she testified at the DLR hearing that she hired poll workers and at her deposition testified that she fired two of them. *See* Gale DLR Tr. at 63 (#78-1 at 9); Gale Depo. Tr. at 80-81 (#78-2 at 9-10); *id*. at 109 (#78-2 at 25). She also testified at her deposition that as the Election Consultant, she had concerns about a poll worker, communicated them to Hurtubise or the Board, and Hurtubise or the Board took her recommendation, Gale Depo. Tr. at 73-74 (#78-2 at 7-8), and her recommendations would have presumably carried equal or greater weight as the Election Coordinator.

29 C.F.R. §541.105 lists factors relevant to the determination of whether an employee's suggestions or recommendations have "particular weight," including, but not limited to, whether one of the employee's duties is to make such suggestions and recommendations and the frequency with which they are requested, made, and relied on. *Id.* An employee's suggestions or recommendations may still be deemed to have "particular weight" if a higher-level employee's suggestions and recommendations have greater weight and even if the employee does not have the ultimate authority to hire and fire. *Id.*

Yet 29 C.F.R. §541.105 also states: "**Generally, an executive's suggestions and recommendations must pertain to employees whom the executive customarily and regularly directs**. It does not include an occasional suggestion with regard to the change in status of a co-worker…." *Id*. (bold supplied). This language suggests that the City's reliance on the Plaintiff's authority over poll workers on the fourth prong may suffer from the same flaw as its reliance on the Plaintiff's authority over poll workers on the third prong. But the word "generally" allows for

an exception to the rule, and the Plaintiff has not addressed this language. *See* #65 at 10; #83 at 10-11.

(c) Second prong.

On the second prong -- whether the Plaintiff's "primary duty [was] management of the enterprise in which the employee is employed or of a customarily recognized department or subdivision thereof," *see* 29 C.F.R. §541.100(a)(2), she argues that her "primary duty" was not "management," *see* #65 at 10, but a reasonable jury could find that it was. Under 29 C.F.R. §541.102, "management" generally includes such activities as

• Interviewing, selecting, and training employees;

• Setting and adjusting their pay and hours;

• Directing employee work;

• Maintaining production or sales records for use in supervision or control;

• Appraising productivity and efficiency for purposes of recommending promotions or other changes in employee status

• Handling employee complaints and grievances and disciplining them;

• Planning the work, techniques to be used, and apportioning the work among employees

• Determining the type of materials, supplies, machinery, equipment, or tools to be used or merchandise to be bought, stocked, and sold;

• Controlling the flow and distribution of materials or merchandise and supplies;

• Providing safety and security for employees and property;

• Planning and controlling the budget; and

• Monitoring or implementing legal compliance measures.

*Id*.

The Plaintiff's self-identified "core" activities included recruiting, training, and scheduling poll workers. *See id*.[40] She admittedly "monitor[ed] or implement[ed] legal compliance." *See id*.; *see also* Gale Depo. Tr. at 87-88 (#78-2 at 16-17). A reasonable jury could find that monitoring and implementing legal compliance was a relatively important duty compared to the Plaintiff's other duties. *See* 29 C.F.R. §541.700(a) ("primary duty" factors include relative importance compared to other duties); *see also* #65 at 12 ("conducting elections in compliance with state law is one of [the City's] core statutory obligations").

The Plaintiff's self-identified "core" activities in setting up polling places (e.g. confirming that each location had the required ballots, etc.) and processing ballots (e.g. sorting them into designated batches for counting and securely storing them for transport), *see* Gale Aff. ¶ 21, can be considered determination of the type of supplies to be used and control of their flow. *See* 29 C.F.R. §541.102.

A reasonable jury could find that in 2022, the Plaintiff "plan[ned]" the election budget with others. *See id*. The input she offered showed familiarity with past budgets, *see* #78-7 at 2 ("[h]ave never used this line item;" "[t]his was built in as a safety net"), and a reasonable jury could find that because the City Council asked her to present the budget, *see* Gale Depo. Tr. at 86 (#78-2 at 15), budgetary planning was a relatively important duty compared to the Plaintiff's other duties.

The court acknowledges the Plaintiff's argument that she reported to Hurtubise and followed Massachusetts election laws and detailed Secretary of State guidelines. *See* #65 at 11; *see also* 29 C.F.R. §541.700(a) ("primary duty" factors include relative freedom from direct

---

[40] Unlike 29 C.F.R. §541.105, §541.102 does not appear to be tied to the "customarily and regularly" requirement. The "primary duty" test is not based solely on time spent performing exempt versus nonexempt work. *Marcus*, 80 F.4th at 38; *Marzuq*, 807 F.3d at 436; 29 C.F.R. §541.700(a), (b).

supervision). But Hurtubise's supervision of the Plaintiff is genuinely in dispute. A reasonable jury could find that he intended to relinquish his voting responsibilities to the Plaintiff, *see* #78-13 at 5, and from her claim to be "providing all the functions of" an election department head, *see* Gale Depo. Tr. at 97 (#78-2 at 19), a reasonable jury could find that she believed that she had relative freedom from direct supervision.

Even assuming that Hurtubise directly supervised the Plaintiff and her activities were controlled by state law and guidelines, those facts do not "decisively point one way or the other on the primary duty question" at this stage. *Marzuq*, 807 F.3d at 444 (vacating entry of summary judgment in favor of employer notwithstanding that the record showed that the assistant managers were "closely supervised" as precedent "accept[s] a confined level of authority") (discussing *Donovan v. Burger King Corp.*, 672 F.2d 221, 223, 225 (1st Cir. 1982) (the primary duty of the assistant managers was management although many of their tasks were "governed by highly detailed, step-by-step instructions" in the operating manual, which "admit[ted] of little or no variation")).

ii. Administrative exemption.

(a) Second prong.

On the second prong of the administrative exemption, the Plaintiff's "primary duty" must have been "the performance of office or non-manual work directly related to the management or general business operations of the employer or the employer's customers." 29 C.F.R. §541.200(a)(2).[41] The court must identify the Plaintiff's "primary duty" and the City's "business

[41] The phrase "directly related to the management or general business operation" "refers to the type of work performed by the employee. To meet this requirement, an employee must perform work directly related to assisting with the running or servicing of the business, as distinguished, for example, from working on a manufacturing production line or selling a product in a retail or service establishment." 29 C.F.R. §541.201(a).

purpose"[42] and then conduct a "relational" analysis, comparing the primary duty to the business purpose to determine whether the primary duty is directly related to the business purpose, in which case the second prong is not satisfied, or whether the primary duty is directly related to the "running or servicing of the business," in which case the second prong is satisfied. *Unitil Serv. Corp.*, 64 F.4th at 6-7 (quoting 29 C.F.R. §541.201(a)). Stated another way, the relational analysis considers whether the primary duty is ancillary to the principal production activity or principal function. *Id*.

The Plaintiff identifies the City's business purpose as providing lawful elections and argues that the Plaintiff's primary duty was producing the lawful elections, thus, the second prong is not satisfied. (#65 at 12.) The City does not identify a different one, *see* #75 at 5-8, so the court will assume, without deciding, that its business purpose is providing lawful elections.

The Plaintiff relies on so much of the First Circuit's decision in *Marcus*, 80 F.4th 33, *supra*, that held that the tournament directors' primary duty was supervising bridge tournaments, which directly related to the business purpose of their employer, "ACBL," which was to sanction bridge tournaments. Accordingly, the second prong of the administrative exemption was not satisfied. *Marcus*, 80 F.4th at 47; *see also id*. at 47-48 (holding that the second prong was not satisfied as to the national tournament directors and associate national tournament directors).

The City argues that the Plaintiff is like the sales managers in *Hines*, 665 F.3d 235, *supra*, whose employers were in the business of providing banquets. The sales aspects of the businesses, "although necessary to their success, [was] clearly ancillary to the principal function of actually providing the banquet services themselves." *Id.* at 242. The sales managers did not just close the contracts; they worked with clients to customize the banquets and "to establish long-term

---

[42] "Business purpose" is the production or provision of the product or service that the employer offers to the public. *Unitil Serv. Corp.*, 64 F.4th at 6.

relationships, to keep clients happy and to maintain the overall reputation of their employers." *Id*. at 242-43.

To bring it full circle, the First Circuit in *Marcus* regarded the field supervisors and area managers in that case as comparable to the sales managers in *Hines*. Although the field supervisors and area managers spent about 75% of their time directing tournaments, their primary duty was directly related to the "running or servicing of the business." They developed and implemented longer-term processes and programs including tournament planning and review and plans to maintain standards of player satisfaction. "The processes and programs directly relate[d] to the running of ACBL and [were] significant to ACBL because they [were] designed to ensure long-term integrity of bridge tournaments and satisfaction of ACBL's consumers." *Id*. at 48 (citing *Hines*, 665 F.3d at 243).

Moreover, when they were directing tournaments, the field supervisors and area managers were expected to be the point of contact for issues related to tournament operations and staff and to establish and maintain effective relationships with tournament sponsors. These high-level, customer service responsibilities directly related to the running of ACBL. *Id*. at 48-49.

Finally, the field supervisors and area managers had significant supervisory authority over other employees, including writing annual performance reviews and making hiring and firing decisions. "'The supervision of other employees is clearly a management duty….'" *Id*. at 49 (quoting *Burger King*, 672 F.2d at 226).

The City has the better argument, although it is not entitled to judgment as a matter of law. The Plaintiff's self-identified "core" activities of recruiting, training, and scheduling poll workers, processing voter registrations and ballots, and setting up polling places arguably "all go towards producing" a lawful election. *See Marcus*, 80 F.4th at 47-48 (in holding that the second prong was

not satisfied as to the national tournament directors and associate national tournament directors, observing that such additional tasks as training other tournament directors and drafting tournament regulations "all go towards producing" a sanctioned bridge tournament).

But the City disputes that these were the Plaintiff's "core" activities, *see* #76 ¶¶ 19-20, and as discussed, a reasonable jury could find that budgetary planning was (or was not) a primary duty. Budgetary planning is directly related to the "running or servicing of the business." *See* 29 C.F.R. §541.201(b) ("budgeting" listed among activities "directly related to management or general business operations"). And a reasonable jury could find that the Plaintiff had hiring and firing authority (or not) and that authority was her primary duty (or not).

(b) Third prong.

As for the third prong -- whether the Plaintiff's "primary duty include[d] the exercise of discretion and independent judgment with respect to matters of significance," *see* 29 C.F.R. §541.200(a)(3), that the Plaintiff allegedly reported to Hurtubise and followed Massachusetts election laws and detailed Secretary of State guidelines is not dispositive. *See Reich v. John Alden Life Ins. Co.*, 126 F.3d 1, 13 (1st Cir. 1997) ("the exempt employee need not have final decisionmaking authority over such matters; '[e]ven though an employee's work is subject to approval, even to the extent that a decision may be reversed by higher level management, it does not follow that the work did not require the exercise of discretion and independent judgment'") (quoting *Dymond v. United States Postal Serv.,* 670 F.2d 93, 96 (8th Cir.1982)); *Cheatham v. Allstate Ins. Co.*, 465 F.3d 578, 585 (5th Cir. 2006) (required consultation with guidelines "does not preclude [an employee's] exercise of discretion and independent judgment") (citing *McAllister v. Transamerica Occidental Life Ins. Co.*, 325 F.3d 997, 1001 (8th Cir. 2003) ("McAllister claims she had no discretion to disregard state law or the claims manual, but she focuses on the wrong

issue"); *see also* 29 C.F.R. §541.202(c) ("employees can exercise discretion and independent judgment even if their decisions or recommendations are reviewed at a higher level"); 29 C.F.R. §541.704 ("The use of manuals, guidelines or other established procedures containing or relating to highly technical, scientific, legal, financial or other similarly complex matters that can be understood or interpreted only by those with advanced or specialized knowledge or skills does not preclude exemption…").

The exercise of discretion and independent judgment "involves the comparison and the evaluation of possible courses of conduct, and acting or making a decision after various possibilities have been considered." 29 C.F.R. §541.202(a). The phrase "matters of significance" refers to "the level of importance or consequence of the work performed." *Id.*

The Plaintiff is not entitled to summary judgment on the inapplicability of the administrative exemption under the third prong. A reasonable jury could find that she exercised discretion and independent judgment as to which poll workers to hire and fire and that such decisions were matters of significance.

Furthermore, there is evidence that she investigated matters of significance on behalf of management. *See* 29 C.F.R. §541.202(b); *see also* Gale Supp. Aff. ¶ 13 (appeared before the Board to answer questions about the denial of a provisional ballot). There is evidence that she provided expert advice to management. *See* 29 C.F.R. §541.202(b); *see, e.g.,* #78-4 at 2 (advised the Mayor about a statutory requirement); Gale DLR Tr. at 41 (#78-1 at 7) (trained the Election Commissioners).

VI. Conclusion.

For the reasons set out above, the court grants summary judgment on liability to the Plaintiff on so much of Count VII that is a claim for late payments. Otherwise, the Plaintiff's

motion for summary judgment (#64), is denied.

The court grants summary judgment on liability to the City on Count II. The court grants summary judgment on liability to the City on so much Count VI that is a claim for overtime wages for hours worked in excess of 8 hours on days other than Wednesdays and in excess of 40 hours a week. Otherwise, the City's cross-motion for summary judgment (#75), is denied.

September 30, 2026

/s/ M. Page Kelley
M. PAGE KELLEY
UNITED STATES MAGISTRATE JUDGE